IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| P.J., a minor, by and through his parents and natural guardians, BARBARA and DAREN JENSEN; BARBARA JENSEN, individually; and DAREN JENSEN, individually,<br><br>    Plaintiffs,<br><br><br>    vs.<br><br><br>STATE OF UTAH; INTERMOUNTAIN HEALTH CARE, INC.; KARI CUNNINGHAM, in her individual capacity; RICHARD ANDERSON, in his individual and official capacities; LARS M. WAGNER, in his individual capacity; DAVID L. CORWIN, in his individual capacity; CHERYL M. COFFIN, in her individual capacity; KAREN H. ALBRITTON, in her individual capacity; SUSAN EISENMAN, in her individual capacity; and JANE AND JOHN DOE, in their individual capacities,<br><br>    Defendants. | ORDER ON MOTIONS TO DISMISS<br><br><br><br>Case No. 2:05CV00739 PGC |

A months-long ordeal between plaintiffs Daren and Barbara Jensen and the State of Utah over medical care for P.J., the Jensens' minor son, began in 2003 when doctors at Primary Children's Medical Center diagnosed P.J. with Ewing's sarcoma. The Jensens asked for confirmatory tests, which were not immediately performed. The disputed diagnosis triggered an

neglect investigation by the State's Division of Child and Family Services because the Jensens refused to require P.J. to submit to chemotherapy.  It also led to a juvenile court proceeding in which the Jensens lost legal custody of P.J. to the State.  The case garnered widespread media interest, bringing the Jensens unwanted notoriety.  Mr. and Mrs. Jensen eventually were indicted for kidnapping their own son.

After months of wrangling, DCFS decided it could not force P.J. to submit to chemotherapy without parental support and moved the juvenile court to dismiss the case.  The Salt Lake District Attorney's Office also dismissed the kidnapping charges against the Jensens in exchange for their plea in abeyance to a lesser misdemeanor charge of custodial interference.

The Jensens then filed this civil rights action, seeking damages for alleged violations of the United States and Utah Constitutions, for wrongful initiation of criminal charges, and for intentional infliction of emotional distress.  The crux of the Jensens' allegations is that DCFS employees, doctors, and attorneys in the Utah Attorney General's office maliciously mislead Utah courts in their efforts to force P.J. to submit to chemotherapy.  They also allege that the juvenile court proceeds were conducted unfairly due to numerous misrepresentations and that the defendants' conduct led to unwarranted criminal proceedings against Mr. and Mrs. Jensen.

Before the court are motions by the Jensens to certify a question to the Utah Supreme Court and by the defendants to dismiss the Jensens' claims.  The court denies the Jensens' motion to certify; at this early stage, the court cannot confidently conclude that all the requirements in Rule 41 of the Utah Rules of Appellate Procedure are met.   With respect to the motion to dismiss, the court is required to assume the truth of the Jensens' allegations.

Proceeding on the basis, and as more fully discussed below, the court grants the defendants'

motion in these particulars: (1) all claims against the State of Utah fail because of sovereign

immunity; (2) the Jensens' fourth and eighth causes of action fail to state a claim and must be

dismissed as against all defendants; (3) the Jensens fail to state a claim against Richard Anderson

in his official capacity; (4) plaintiff P.J. fails to state a claim for malicious prosecution or for

denial of a Fourteenth Amendment liberty interest in refusing medical care; and (5) all claims

against Dr. Corwin and Dr. Coffin are dismissed because these two doctors are entitled to

absolute immunity.  The court denies the defendants' motions in all other respects.

### I.        Rule 12(b)(6) Standard

Defendants have moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  The court may grant a Rule 12(b)(6) motion "only if it appears beyond a doubt that

the plaintiff[s] [are] unable to prove *any* set of facts entitling [them] to relief under [their] theory

of recovery."[1]  The court does not determine whether defendants actually did what the plaintiffs

say they did — the law *requires* the court to "'accept as true all well-pleaded facts, as

distinguished from conclusory allegations,'" in the Jensens' complaint.[2]  The court also "must

view all reasonable inferences in favor of the plaintiff, and the pleadings must be liberally

construed" in the plaintiffs' favor.[3]

---

[1]*Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002) (emphasis added).

[2]*Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005) (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir. 1998)).

[3]*Ruiz*, 299 F.3d at 1181.

These legal rules do *not* mean that if a court denies the motions to dismiss and thereby allows the lawsuit to continue that the defendants are automatically liable and that the plaintiffs will certainly win.  "The issue in reviewing the sufficiency of the complaint is not whether the plaintiff[s] will prevail, but whether the plaintiff[s] [are] entitled to offer evidence to support [their] claims."[4]  Thus, when resolving this type of motion, the court's job is essentially to ask: If everything the plaintiffs allege is true, do those allegations establish an injury that the law redresses?  If the answer is yes, the case continues, allowing the plaintiffs to gather evidence that *proves* to a jury, beyond a preponderance of the evidence, that the allegations in their complaint are true.

## II.      The State of Utah's Motion to Dismiss

The Jensens named the State of Utah as a defendant in their fifth through tenth causes of action.  Plaintiffs' fifth, sixth, seventh, and eighth claims seek damages for violations of various provisions of the Utah Constitution.  Their ninth and tenth claims seek tort damages.  For the reasons explained more fully below, the court GRANTS the State's motion to dismiss these claims.

### A.      Violations of the Utah Constitution

The State argues that sovereign immunity bars the Jensens' Utah constitutional claims against it.  The court agrees.

In *Spackman ex rel. Spackman v. Board of Education*, the Utah Supreme Court said that, except for one provision not applicable here, "the Utah Constitution does not expressly provide

---

[4]*Id.*

damages remedies for constitutional violations."[5]  Similarly, under Utah law, "there is no express statutory right to damages for one who suffers a constitutional tort."[6]  Accordingly, "a Utah court's ability to award damages for [a] violation of a self-executing constitutional provision rests on the common law."[7]

At common law, the State was immune from suit.  The Utah Supreme Court has said that "[s]overeign immunity was as a settled feature of the common law when Utah became a state and adopted its constitution."[8]  The Utah Supreme Court defined the common law doctrine of sovereign immunity in these terms: "'[I]n the absence of either express constitutional or statutory authority an action against a sovereign state cannot be maintained.  The doctrine is elementary and of universal application, and so far as we are aware there is not a single authority to the contrary.'"[9]

In this case, the Jensens have not pointed to "express constitutional or statutory authority" that waives Utah's sovereign immunity and permits claims against the State for violations of the specific Utah constitutional provisions cited in their complaint.  The State's common law sovereign immunity thus bars the Jensens' constitutional claims against it.

_____

[5]16 P.3d 533, 537 (Utah 2000).

[6]*Id.*

[7]*Id.* at 538.

[8]*Tiede v. State*, 915 P.2d 500, 504 (Utah 1996).

[9]*Id.* (quoting *Wilkinson v. State*, 134 P. 626, 630 (Utah 1913)).

B.      *Tort Claims*

Though the State has retained sovereign immunity for constitutional violations, the Utah

Legislature has waived the State's immunity for certain tort claims.  The Utah Governmental

Immunity Act allows claims against the State "for injury proximately caused by a negligent act or

omission of an employee committed within the scope of employment."[10]  The UGIA, however,

waives immunity only for negligent, not for intentional, torts.  The limits of this waiver are fatal

to the Jensens' two tort causes of action — intentional infliction of emotional distress and

wrongful initiation of process — because both are intentional torts.[11]  As such, the UGIA does

not waive the State's immunity for these two causes of action.

And even if these two causes of action could be classified as stemming from a State

actor's negligence, the UGIA reinstates sovereign immunity in the circumstances alleged here.  If

a plaintiff's injury is "proximately caused by a negligent act . . . of an employee" but "arises out

of, in connection with, or results from: . . . malicious prosecution, . . . abuse of process, . . . [or]

infliction of mental anguish," that injury cannot form the basis for state liability.[12]  Since the

Jensens' two tort causes of action arise out of malicious prosecution, abuse of process, and

infliction of mental anguish, the UGIA bars these claims against the State.

---

[10]*See* Utah Code Ann. § 63-30-10 (2003).

[11]*See Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 535 (Utah 2002) (intentional
infliction of emotional distress); *Brown's Shoe Fit Co. v. Olch*, 955 P.2d 357, 367 n.12 (Utah Ct.
App. 1998) (wrongful initiation of proceedings).

[12]*See* Utah Code Ann. § 63-30-10(2).

In sum, the court grants the State's motion and dismisses under Rule 12(b)(6) all of the Jensens' claims against it.  The State has not waived sovereign immunity for its employees' intentional torts or their violations of the Utah Constitution.

**III.     State Employees' Motion to Dismiss**

Defendants Richard Anderson, Susan Eisenman, and Kari Cunningham were all employees of the State of Utah when the events relevant to this lawsuit occurred.  Mr. Anderson was DCFS's director.  Ms. Eisenman was an assistant attorney general in the State's Attorney General's Office.  Ms. Cunningham was a DCFS social worker.  The court will address each argument these three defendants make in their motion, beginning with arguments applicable only to Anderson and Eisenman and then discussing arguments common to all three.

*A.     Defendant Richard Anderson*

The Jensens sued Mr. Anderson in both his official and individual capacities.  He argues that the court should dismiss the individual capacity claims because the Jensens have failed to plead a causal link between his conduct and any constitutional violations as § 1983 requires.  He also argues that the official capacity claims should be dismissed because, in his official capacity, he is not a "person" for purposes of § 1983.  The court holds that the individual capacity claims should not be dismissed but that the official capacity claims should be.

1.     Individual Capacity

Mr. Anderson argues that the Jensens' § 1983 claims against him in his individual capacity should be dismissed because the Jensens failed to allege an "affirmative link" between his conduct and any constitutional violation.  Mr. Anderson is correct that the Jensens may not

hold him liable merely because DCFS employees he supervises may have violated the Jensens'
constitutional rights: "under § 1983, 'a defendant may not be held liable under a theory of
respondeat superior.'"[13]  "Instead, '[the Jensens] must show that an affirmative link exists
between the [constitutional] deprivation and either [Mr. Anderson's] personal participation, his
exercise of control or discretion, or his failure to supervise.'"[14]

The complaint sufficiently Mr. Anderson's personal involvement in this case by alleging
that he flew to Idaho on September 15, 2003, to negotiate with the Jensens and that he supported
a September 5 stipulation between the Jensens and DCFS to have P.J. evaluated by an Idaho
physician.  The Jensens also allege that while in Idaho, Mr. Anderson said to Mr. Jensen, "We
can tell that you're not a neglectful parent, but we just can't let you go."[15]

As noted above, Rule 12(b)(6) requires the court to accept these factual allegations as
true.[16]  The court also "must view all reasonable inferences in favor of the plaintiff, and the
pleadings must be liberally construed."[17]  The court may grant Mr. Anderson's motion "only if it
appears *beyond a doubt* that" the Jensens are "unable to prove *any* set of facts entitling [them] to
relief under [their] theory of recovery."[18]  These legal standards compel the court to deny Mr.

---

[13]*Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003) (quoting *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000)).

[14]*Id.* (citing *Worrell*, 219 F.3d at 1214).

[15]Compl. ¶ 157.

[16]*Ruiz*, 299 F.3d at 1181.

[17]*Id.*

[18]*Id.* (emphases added).

Anderson's motion to dismiss.  The Jensens' complaint adequately alleges an affirmative link "between the [constitutional] deprivation and either . . . [Mr. Anderson's] exercise of control or discretion[] or his failure to supervise.'"[19]  The complaint alleges that Mr. Anderson's office had intensive, day-to-day involvement in the Jensens' case during 2003.  A reasonable inference from the entire complaint — not just from the allegations that specifically mention Mr. Anderson — is that Mr. Anderson, as DCFS's director, personally participated in, exercised control or discretion over, or failed to supervise his employees' actions in the Jensens' case.

Of course, allowing the claims against Mr. Anderson in his individual capacity to proceed does not mean that the Jensens will prevail.  The Jensens have much more to prove before their claims against Mr. Anderson in his individual capacity could survive summary judgment, for at the summary judgment stage, unlike here, the issue is in fact "whether the plaintiff[s] will prevail," not just whether they have *alleged* that they will.[20]  At this stage, however, the Jensens may proceed with their claims.

## 2.    Official Capacity

Mr. Anderson also seeks dismissal of all claims against him in his official capacity.  His motion is based on the Tenth Circuit's holding that "[n]either the state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes, *nor a state official who acts in his or her official capacity*, is a 'person' within the meaning of § 1983."[21]  In addition to this Tenth

---

[19]*Id.* (citing *Worrell*, 219 F.3d at 1214).

[20]*Id.*

[21]*Harris v. Champion*, 51 F.3d 901, 905–06 (10th Cir. 1995) (emphasis added).

Circuit holding, the Supreme Court has held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself."[22]

The Jensens concede that their § 1983 claims against Mr. Anderson in his official capacity should be dismissed based on *Harris v. Champion*.[23]  They contend, however, that the remainder of their claims against Mr. Anderson (state constitutional violations and tort claims) "are cognizable in both capacities."[24]  This position fails to account for the Supreme Court's holding in *Will v. Michigan Department of State Police* that claims against a state officer such as Mr. Anderson in his official capacity — regardless of the type of claim — are "no different" than claims against the State itself.[25]  The court therefore holds that the Jensens' tort and state constitutional claims against Mr. Anderson in his official capacity fail for the same reasons those claims fail as against the State of Utah.

The Jensens fail to state a claim against Mr. Anderson in his official capacity upon which relief may be granted.  The court therefore dismisses all such claims against him.

   *B.    Susan Eisenman*

Ms. Eisenman, sued in her individual capacity only, argues that she is entitled to absolute prosecutorial immunity from all the Jensens' claims.  Absolute prosecutorial immunity extends

---

[22]*Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989) (citation omitted).

[23]Pls.' Mem. in Opp'n to Mot. to Dismiss of Defs. Cunningham and Eisenman (Docket No. 36), *Jensen v. Utah*, Case No. 2:05-CV-739 PGC (D. Utah filed Jan. 17, 2006).

[24]Docket No. 36, at 10.

[25]491 U.S. at 70–71.

to prosecutors when they "perform[] the traditional functions of an advocate."[26]  But immunity

does not extend to "those aspects of the prosecutor's responsibility that cast him in the role of an

administrator or investigative officer rather than that of advocate.'"[27]  For example, in *Kalina v.*

*Fletcher*, the Supreme Court held that a prosecutor was not entitled to absolute immunity when

she provided affidavit testimony in support of a criminal information and arrest warrant.[28]  The

Court said that immunity did not attach because the prosecutor "performed an act that any

competent witness may have performed."[29]  Thus, whether Ms. Eisenman is entitled to absolute

immunity depends on whether the complaint alleges that her actions were prosecutorial or

investigatory.

The Jensens' memorandum in opposition to the motion to dismiss identifies three specific

instances of investigatory conduct alleged in their complaint.  First, they allege that Ms.

Eisenman contacted Dr. Jeorg Birkmayer, an Austrian physician whom the Jensens had contacted

to treat their son.  Paragraph 104 of their complaint alleges that Ms. Eisenman e-mailed Dr.

Birkmayer and asked, "As I am sure you are aware, the American Academy of Pediatrics has

established a standard of care for pediatric cancer patients.  Is there a similar standard of care for

patients in Australia?"  Second, the Jensens allege that Ms. Eisenman was a complaining witness

in the juvenile court.  Citing paragraphs 127 and 150 of their complaint, the Jensens claim that

---

[26]*Kalina v. Fletcher*, 522 U.S. 118, 131 (1997).

[27]*Id.* at 125 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976)).

[28]*See id.* at 128–30.

[29]*Id.* at 129–30.

Ms. Eisenman made specific factual misrepresentations to the juvenile court regarding their alleged disobedience to the court's orders and their son's chance of survival without chemotherapy.  Third, the Jensens allege in paragraphs 141 through 143 of their complaint that Ms. Eisenman was a complaining witness when she went to Salt Lake County and provided information that led to kidnapping charges against Mr. and Mrs. Jensen.

In response to the Jensens' allegations that she was a complaining witness, Ms. Eisenman claims that she made all her statements to the juvenile court in her role as an advocate and not as a complaining witness.  Her counsel also states that:

> To the extent any residual claims remain concerning the criminal [kidnapping] case against Barbara Jensen or Daren Jensen, without allegations that Ms. Eisenman was the affiant in support of their arrest warrant, a complaining witness referenced therein, or a prosecuting attorney, there is simply no affirmative link between her actions and any constitutional violation.  Moreover, Plaintiffs could not make those allegations because Ms. Eisenman was not the affiant *and is not to be found anywhere* in either the *Information* or the *Probable Cause Statement* for Barbara Jensen or for Daren Jensen (attached as Exhibits 1 and 2).[30]

The court reviewed Exhibits 1 and 2, the criminal informations charging Mr. and Mrs. Jensen with kidnapping.  This statement appears on the second page of each exhibit: "THIS INFORMATION IS BASED ON EVIDENCE OBTAINED FROM THE FOLLOWING WITNESSES: T. Peterson, K. Cunningham, M. McDonald, *S. Eisenman*, P.J., and B. Nakamura."[31]

---

[30]Docket No. 46, at 9–10 (emphasis added).

[31]*See id.* Ex. 1 & 2, at 2 (emphasis added).

Her counsel conceded at oral argument that "S. Eisenman" was defendant Susan

Eisenman but disputed the nature and extent of her involvement.  Yet the question remains: did

Susan Eisenman provide factual information to the District Attorney's office that led to criminal

charges against Mr. and Mrs. Jensen?  These exhibits create a question of fact about whether she

did.  Since the court must view all inferences in the Jensens' favor, these exhibits are sufficient to

defeat Ms. Eisenman's claim to absolute prosecutorial immunity at this time.  The plaintiffs,

however, may proceed only as to the limited matters allegedly performed outside Eisenman's

prosecutorial capacity.  The court understands that such subjects would be relatively narrow.

C.     *P.J.'s Individual Claims*

The State employees next claim that P.J. lacks standing to bring his § 1983 claims

because he cannot show "an invasion of a legally protected interest."[32]  The Supreme Court has

made clear that this requirement is a necessary predicate for Article III jurisdiction to exist.[33]  But

recent Tenth Circuit authority shows that defendants' arguments confuse standing with the merits

of P.J.'s claims.  The court will discuss this authority before addressing the employees'

arguments.

In *Initiative & Referendum Institute v. Walker*, the Tenth Circuit addressed a First

Amendment challenge to a Utah Constitution amendment governing wildlife initiatives.[34]  The

defendants argued that the plaintiffs had no standing to challenge the amendment.  The circuit

---

[32]*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508
U.S. 656, 663–64 (1993).

[33]*See id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[34]No. 02-4105, 2006 WL 1377028, at *1 (10th Cir. May 17, 2006).

rejected that argument, stating that "[f]or purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest.  If that were the test, every losing claim would be dismissed for want of standing."[35] Thus, "where the plaintiff presents a nonfrivolous legal challenge, alleging an injury to a protected right such as free speech, the federal courts may not dismiss for lack of standing on the theory that the underlying interest is not legally protected."[36]

Here, P.J. alleges injuries to rights he claims are protected by the Fourteenth Amendment. The State employees' motion to dismiss turns on whether "the Constitution, properly interpreted, extends protection to [P.J.'s] asserted right or interest."  If the court dismisses P.J.'s claims, it is because the Constitution does *not* protect the rights P.J. asserts — a quintessential merits question.  *Walker* thus prohibits the court from dismissing P.J.'s claims for lack of standing. Instead, the court will construe the motion as one to dismiss for failure to state a claim.

> 1.    Does P.J. Have a Substantive Due Process Right to Refuse Medical Treatment?

The State employees attack P.J.'s first cause of action, labeled "Liberty interest / Due Process," which alleges that P.J. "had a clearly established fundamental right and liberty interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to

---

[35]*Id.* at *8.

[36]*Id.* at *9.

refuse unwanted medical treatment."[37]  They argue that "P.J. could not refuse to consent to medical treatment; he consequently lacked a liberty interest in directing his own medical care."[38]

This is a troubling proposition.  Taken to its logical conclusion, accepting the defendants' argument would mean that *all* children, by virtue of their minority, would be incapable of refusing to consent to medical care and therefore would *never*, under any circumstances, have a constitutionally protected interest in refusing medical treatment.  This would be a broad conclusion indeed.

The defendants do not cite any case that holds that minors lack a Fourteenth Amendment right to refuse medical treatment.  On the other hand, the cases the Jensens cite strongly imply (but do not hold) that a minor may have a liberty interest to refuse medical treatment.  For instance, the Jensens cite *Parham v. J.R.*, where Supreme Court held that a mentally challenged minor child had a liberty interest in "not being confined unnecessarily for medical treatment."[39]  A later case, however, clarified that *Parham* "certainly did not intimate that such a minor child, after commitment, would have a liberty interest in refusing treatment."[40]  Ultimately, *Parham* is not dispositive because it discussed liberty interests of minor children with mental health problems and was limited to unnecessary confinement, not unwanted treatment.  Here, plaintiff

---

[37]Compl. ¶ 189.

[38]Doc. 24, at 7.

[39]442 U.S. 584, 600 (1979).

[40]*Cruzan v. Missouri Dep't of Health*, 497 U.S. 261, 279 (1990).

P.J. does not have a diagnosed mental illness and he refused treatment rather than institutionalization.

P.J. also cites *Cruzan v. Missouri Department of Health*.  In *Cruzan*, the Supreme Court said that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."[41]  The Court, citing *Parham*, also that "[s]till other cases support the recognition of a general liberty interest in refusing medical treatment."[42]  And later in its decision, the Court said, "[i]t cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."[43]  Again, these cases — while instructive — are not dispositive because, with the exception of *Parham*, all involved adults rather than minors.

The Jensens also cite Tenth Circuit precedent to show that P.J. has a liberty interest to refuse unwanted medical care.  In *Dubbs v. Head Start, Inc.*, parents brought § 1983 claims for physical examinations of their children that allegedly violated the children's "right to refuse medical treatment."[44]  While the Tenth Circuit said that "[i]t is not implausible to think that the right[] invoked here — the right to refuse a medical exam . . . — fall[s] within this sphere of protected liberty,"[45] it declined to resolve the issue and instead relied on the children's Fourth

---

[41]497 U.S. at 278.

[42]*Id.*

[43]*Id.* at 281.

[44]336 F.3d 1194, 1202 (10th Cir. 2003).

[45]*Id.* at 1203.

Amendment rights to resolve their claims.[46]   *Dubbs* is also inapposite because P.J., unlike the minors in *Dubbs*, was never searched or required to undergo treatment.

Based on these cases, the court holds that a child as young as P.J. did not have his own right to refuse medical treatment.  Instead, that right belongs to his parents.  In other words, P.J.'s claim is subsumed by his parents' claim, at least under clearly established law.  The court therefore grants the motion to dismiss the Jensens' first cause of action as to P.J.

<u>2.      Familial Association</u>

The State employee defendants next incorrectly claim that minor children have no Fourteenth Amendment liberty interest in familial association.  In 1997, the Tenth Circuit decided *J.B. v. Washington County*.[47]   The two plaintiffs in that case were a mother and her minor child who sued under § 1983 for alleged violations of their substantive due process right to familial association.[48]   The Tenth Circuit said that "[p]laintiffs' right to familial association is included in the substantive due process right of freedom of intimate association, which is 'consonant with the right of privacy.'"[49]   The court also said that "[u]ndeniably, plaintiffs have a substantial interest in the right to associate with their family."[50]   The repeated use of the plural "plaintiffs," referring both to the mother *and* her minor daughter, shows that the right to familial

---

[46]*See id.*

[47]127 F.3d 919 (10th Cir. 1997).

[48]*See id.* at 927.

[49]*Id.* (quoting *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993)).

[50]*Id.*

association did not belong to the mother only.  On this basis, the court holds that minor children have liberty interests in familial association that are protected by the Fourteenth Amendment. Defendants' argument as to this point fails.

### 3.     Malicious Prosecution

Finally, the defendants ask the court to dismiss P.J.'s third cause of action, labeled "Fourth Amendment / Malicious prosecution."  The court holds that P.J. fails to state a malicious prosecution claim and therefore grants defendants' motion.

In *Taylor v. Meacham*, the Tenth Circuit said that it "takes the common law elements of malicious prosecution as the 'starting point' for the analysis of a § 1983 malicious prosecution claim, but always reaches the ultimate question, which it must, of whether the plaintiff has proven a *constitutional* violation."[51]  "[I]n the § 1983 malicious prosecution context, that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures."[52]

Here, P.J. fails to state a claim for malicious prosecution because his allegations do not establish each of that claim's four common law elements, which are : "(1) A criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the accused; (3) absence of probable cause for the proceeding; (4) 'malice,' or a primary purpose other than that of bringing an offender to justice."[53]  Since P.J. does not allege that the defendants instituted criminal proceedings against him, this claim fails.

---

[51]82 F.3d 1556, 1561 (10th Cir. 1996).

[52]*Id.*

[53]*Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct. App. 1987).

-18-

And even if the court were to construe this claim as alleging a denial of P.J.'s Fourth Amendment right to be free from unreasonable seizures — without malicious prosecution overtones — the claims still fails.  Of the "seizures" alleged, those applicable to P.J. are: (1) he was unable to travel freely, and (2) he was required to be physically present in court or at other specified locations on numerous occasions.[54]  Accepting these facts as true, these events do not implicate the Fourth Amendment.  They are more properly addressed as violations of P.J.'s liberty interests, wrongs for which he seeks redress in his other causes of action.

D.      *The Jensens State a Claim for Deprivation of Familial Association Rights.*

The State employee defendants next argue that the Jensens' familial association claim fails because the defendants' actions were not unduly burdensome or, alternatively, because the defendants are entitled to qualified immunity.  The court disagrees with both assertions.

The Jensens' "familial right of association is properly based on concept of liberty in the Fourteenth Amendment."[55]  The Tenth Circuit has held that "[t]o determine whether a person's familial association rights have been violated" requires "'a balancing [of] liberty interests against the relevant state interests.'"[56]  The question when weighing these interests is whether the State's conduct "constituted an undue burden on" the plaintiffs' associational rights.[57]  And "'[n]ot every statement or act that *results* in an interference with the rights of intimate association is

_____

[54]*See* Compl. ¶ 199.

[55]*Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993).

[56]*Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

[57]*Id.*

-19-

actionable.'  The conduct or statement must be directed 'at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship.'"[58]

On one side of the scale in this balancing test is the Jensens' "right to associate with [their] family," which "is a very substantial right."[59]  This right includes — but is not limited to — parents' right to direct their child's medical care.  The Supreme Court has frequently "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children,"[60] for "'[f]amily relationships by their nature, involve deep attachments and commitments to the necessary few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctly personal aspects of one's life.'"[61]

Opposite the Jensens' interests sits the State's "'traditional and transcendent interest' in protecting children from abuse and from situations where abuse might occur."[62]  Precedent clearly shows that "the state itself has a compelling interest in the health, education and welfare of children."[63]

---

[58]*J.B.*, 127 F.3d at 927 (quoting *Griffin*, 983 F.2d at 1548 (citation omitted)).

[59]*Griffin*, 983 F.2d at 1548.

[60]*Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) (citing cases).

[61]*J.B.*, 127 F.3d at 927 (quoting *Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305, 312–13 (11th Cir. 1989) (quotation marks and citation omitted)).

[62]*Griffin*, 983 F.2d at 1548 (quoting *Maryland v. Craig*, 497 U.S. 836, 855 (1990) (quotation marks and citation omitted)).

[63]*Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994).

This case presents the somewhat unusual situation where the parents' firm opinions about what treatment was best for their son did not coincide with the State's recommendations. Accepting the complaint's allegations as true, the Jensens agreed with the State all along that P.J. might well have cancer but wanted to confirm that it was Ewing's before subjecting him to the rigorous chemotherapy required to treat that specific cancer.  The Jensens allege that the State refused to perform certain genetic tests that would have confirmed P.J.'s diagnosis of Ewing's. They also accuse the State defendants of acting in concert to maliciously remove P.J. from his parents' care and force him — against his will and his parents' wishes — to begin chemotherapy. And the complaint alleges that in 2003, the State deliberately made specific misrepresentations in Utah courts that led to the transfer P.J.'s legal custody to the State, eliminated P.J.'s ability to receive care from doctors of his parents' choice, and led to Mr. Jensen's arrest and criminal charges against Mr. and Mrs. Jensen.

Despite the State's admittedly compelling interest in the health of its children, the court holds that, based on the complaint's allegations, the balancing tips in favor of the Jensens.  Here, the parents' attempt to secure a reasonable confirmatory diagnosis was met first by stonewalling and then by misrepresentations to a court in order to secure the State's preferred treatment, all done with knowledge that the Jensens would be harmed.  To be sure, these allegations are unproven.  The court, however, must accept them as true, and on that basis holds that the familial association claim survives the defendants' motion to dismiss.

For similar reasons, qualified immunity does not shield the State employees from liability for allegedly violating the Jensens' familial association rights.  "When evaluating a qualified

immunity defense, after identifying the constitutional right allegedly violated, courts must determine whether the conduct was objectively reasonable in light of clearly established law at the time it took place."[64]  Here, as discussed, the constitutional right is the Fourteenth Amendment right to familial association and right to direct the care of one's children.  These rights were clearly established when the relevant events occurred during 2003.[65]  It was also clearly established in 2003 that the Jensens had the right not to be deprived of these liberty interests as a result of misrepresentations to state courts by government officials.[66]  The state actions alleged in the complaint — intentional factual misrepresentations and omissions to the state courts — could not have been objectively reasonable in light of this clearly established law.[67]  Because the court must accept the complaint's allegations as true, defendants are not entitled to qualified immunity for this claim at this early stage of the proceedings.

      E.      *The Jensens State a Procedural Due Process Claim.*

The employee defendants next argue that the Jensens cannot state a claim for procedural due process violations because the Fourteenth Amendment's guarantee provides for "'the opportunity to be heard at a meaningful time and in a meaningful manner.'"[68]  The defendants

---

[64]*Pierce v. Gilchrist*, 359 F.3d 1279, 1297 (10th Cir. 2004).

[65]*See Troxel*, 530 U.S. at 66 (plurality opinion) (citing cases); *see also J.B.*, 127 F.3d at 927.

[66]*Pierce*, 359 F.3d at 1297–99.

[67]*See id.*

[68]*Mathews v. Eldridge*, 424 U.S. 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 554 (1965)).

-22-

argue that since the Jensens were afforded ample opportunity to be heard in the state juvenile proceedings, the procedural due process claims must fail.

The defendants' reading of the Due Process Clause, though accurate, is incomplete.  In addition to promising the right to be heard, "[t]he Due Process Clause also encompasses . . . a guarantee of *fair* procedure."[69]  Thus, the Due Process Clause requires more than notice and a hearing — the notice and hearing must also be fair.  The complaint contains allegations that the State employees and the doctors intentionally misrepresented or omitted facts in the Jensens' case, including the status of allegedly confirmatory tests, to the Utah juvenile court.[70]  Thus, for purposes of this motion, the complaint adequately alleges a procedural due process violation.

F.      *Malicious Prosecution Claim*

The State Defendants argue that, since the Jensens pleaded guilty to misdemeanor charges of custodial interference, they cannot state a claim for malicious prosecution.  The defendants assert that the Jensens' plea precludes them from proving a "favorable termination," a required element of a malicious prosecution claim.[71]

At this early stage of the proceedings, the court finds the complaint pleads facts that could potentially support a finding that the Jensens' agreement to plead guilty was coerced through unfair means.  In particular, the Jensens allege that felony charges were filed against them due to the defendants' intentional misrepresentations to the Salt Lake County District Attorney's Office.

---

[69]*Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

[70]*See, e.g.*, Compl. ¶ 127.

[71]*See Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct. App. 1987).

Since the felony charges carried mandatory jail time, defendants' actions ensured that the Jensens would have to plead guilty to a lesser misdemeanor offense to avoid that jail time. If these allegations are correct, the Jensens' plea would not preclude their malicious prosecution action.

G.      *Ninth Amendment Claim*

The Jensens' fourth cause of action seeks damages under § 1983 for alleged violations of the Ninth Amendment. The defendants argue that this cause of action fails to state a claim upon which relief may be granted. The court agrees and dismisses this cause of action.

A number of courts have held that "the Ninth Amendment standing alone does not confer substantive rights for purposes of pursuing a constitutional claim. Specifically, section 1983 civil rights claims premised on the Ninth Amendment must fail because there are no constitutional rights secured by that amendment."[72] And the Tenth Circuit has never held that a § 1983 action can be maintained solely on the basis of a Ninth Amendment violation. To the extent plaintiffs seek to vindicate alleged violations of their constitutionally protected familial association rights, they may properly seek redress under § 1983 based on the Fourteenth Amendment.

---

[72]*Nicolette v. Caruso*, 315 F. Supp. 2d 710, 718 (W.D. Pa. 2003) (citations and quotation marks omitted); *see also Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir. 1986) (same); *Clynch v. Chapman*, 285 F. Supp. 2d 213 (D. Conn. 2003) (same); *Coleman v. Parra*, 163 F. Supp. 2d 876 (S.D. Ohio 2000) (same); *Basile v. Elizabethtown Area Sch. Dist.*, 61 F. Supp. 2d 392 (E.D. Pa. 1999) (same); *DeLeon v. Little*, 981 F. Supp. 728 (D. Conn. 1997) (same); *Williams v. Perry*, 960 F. Supp. 534 (D. Conn. 1996) (same); *Mann by Parent v. Meachem*, 929 F. Supp. 622 (N.D.N.Y. 1996) (same); *In re State Police Litigation*, 888 F. Supp. 1235 (D. Conn. 1995) (same); *Rini v. Zwirn*, 886 F. Supp. 270 (E.D.N.Y. 1995) (same); *Charles v. Brown*, 495 F. Supp. 862 (N.D. Ala. 1980) (same).

-24-

*H.     State Law Claims*

As discussed above, the Jensens seek damages for alleged violations of the Utah

Constitution and for state-law torts.  The State employee defendants seek dismissal of both sets

of claims.  The court will first address the defendants' arguments regarding the Jensens' tort

claims and then their arguments regarding the Jensens' Utah constitutional claims.

1.      Tort Claims Against the State or State Actors

The Utah Governmental Immunity Act requires a claimant to file a notice of claim with

the proper state agency before suing the State or its employees.  The required contents of a notice

of claim are set by statute,[73] and a proper notice of claim is a jurisdictional prerequisite to suit.[74]

The State employee defendants argue that the court lacks jurisdiction over the Jensens' tort

claims because their notice of claim fails to comply with the UGIA's provisions in two respects.

First, the defendants argue that the notice of claim does not adequately state the nature of the

claims asserted.  Second, they argue that notice of claim fails to allege the individual defendants

acted with fraud or malice.  Both assertions are incorrect.

Utah Code Ann. § 63-30-11(3) states that a "notice of claim shall set forth: . . . the nature

of the claim asserted."[75]  Defendants argue that the Jensens' notice of claim sets forth only an

infliction of emotional distress claim, so the remainder of their claims must be dismissed.  In

---

[73]*See* Utah Code Ann. § 63-30-11 (2003).

[74]*Peeples v. State*, 100 P.3d 254, 256 (Utah Ct. App. 2004).

[75]Utah Code Ann. § 63-30-11(3)(a)(ii) (2003).

support of their argument, the defendants cite *Yearsley v. Jensen*.[76]  In *Yearsley*, the Utah

Supreme Court affirmed a district court's decision not to grant leave to amend a complaint where

the plaintiff initially sought damages only for assault and battery but later sought to add a claim

for malicious prosecution and unlawful arrest.[77]  The Utah Supreme Court held: "By no stretch of

the facts can a claim for the physical beating *be construed* to include a claim for malicious

prosecution."[78]  The court also said that the plaintiff's "only demand for damages was for

physical and emotional distress arising from the physical beating.  *Not even an obscure reference*

was made to any other misconduct."[79]  The court concluded its discussion by stating, "a notice of

assault and battery does not *contemplate* a malicious prosecution or a false arrest claim. . . .

There must be enough specificity in the notice to inform as to the nature of the claim so that the

defendant can appraise its potential liability."[80]

      Far from supporting the defendants' position, *Yearsley* cuts against it.  Nowhere in

*Yearsley* did the Utah Supreme Court require the plaintiff to list with exactitude the title of each

cause of action.  Instead, the court spoke of construed allegations, obscure references, and

"enough specificity in the notice to inform as to the *nature of the claim*."[81]  Indeed, the statute

---

[76]798 P.2d 1127 (Utah 1990).

[77]*Id.* at 1129.

[78]*Id.* (emphasis added).

[79]*Id.* (emphasis added).

[80]*Id.* (emphasis added).

[81]*Id.*

itself requires only a description of the *nature* of the claim, not a specific, count-by-count listing of each cause of action sufficient to withstand scrutiny in a code pleading jurisdiction.

After reviewing the Jensens' notice of claim, the court finds that it alleges facts from which defendants easily could have anticipated each of the Jensens' state constitutional and tort causes of action.  And defendants admit that the infliction of emotional distress cause of action satisfies the notice of claim requirements.[82]  Since the notice of claim complies with § 63-30-11(3)(a)(ii), defendants' first argument is without merit.

Defendants' second argument — that the notice of claim fails to allege the individual defendants acted with fraud or malice[83] — likewise fails.  The defendants cite no Utah case holding that a notice of claim must not only describe conduct that is malicious or fraudulent but also must contain the specific words "malice" or "fraud."  Utah courts define "actual malice" or "legal malice" as "conduct that manifests a reckless disregard or indifference to the rights and safety of others."[84]  The Jensens' notice of claim describes defendants' conduct in that fashion, including repeated alleged instances of knowingly making false statements to Utah courts to achieve their ends.  This sufficiently alleges malice or fraud for purposes of the UGIA and permits the Jensens' state claims to proceed.

---

[82]Docket No. 24, at 26.

[83]*See* Utah Code Ann. § 63-30-4(4)(a) (2003).

[84]*Biswell v. Duncan*, 742 P.2d 80, 84 (Utah Ct. App. 1987).

2.      Utah Constitutional Violations

The defendants also argue that the Jensens' Utah constitutional claims must be dismissed because the constitutional provisions allegedly violated are not self-executing.  The court agrees in part with defendants' arguments.

Damages are recoverable for violations of the Utah Constitution only if the provision violated is self-executing, and then only when three elements from *Spackman ex rel. Spackman v. Board of Education* are met: (1) the plaintiff suffered a flagrant violation of constitutional rights; (2) existing remedies do not redress the plaintiff's injuries; and (3) equitable relief was and is wholly inadequate to protect the plaintiff's rights or redress the plaintiff's injuries.[85]  The Jensens allege that defendants violated four provisions of the Utah Constitution: (1) Article I, § 1, dealing with inherent and inalienable rights; (2) Article I, § 7, the Due Process Clause; (3) Article I, § 14, dealing with unreasonable searches and seizures; and (4) Article I, § 25, which reserves unenumerated rights to the people.  For claims under these sections to be viable, the court must first determine whether these provisions are self-executing.  If they are, the court must then decide whether the three-part test is satisfied.

a.      Are the Provisions Self Executing?

Under Utah law,

[a] constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers.  In other words, courts may give effect to a provision without implementing legislation if the framers intended the provision to have immediate effect and if 'no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a

---

[85]*Spackman ex rel. Spackman v. Bd. of Educ.*, 16 P.3d 533, 537–39 (Utah 2000).

duty imposed . . . .'  Conversely, constitutional provisions are not self-executing if they merely indicate a general principle or line of policy without supplying the means for putting them into effect.[86]

The Utah Supreme Court has previously held that Article I, § 7 is self-executing,[87] and defendants here assume that Article I, § 14 is self-executing.  The two contested provisions are therefore §§ 1 and 25 of Article I.  Based on the *Spackman* rule quoted above, the court holds that Article I, § 1 is self-executing.  This section states: "All men have the inherent and inalienable right to enjoy and defend their lives and liberties; . . . and petition for redress of grievances . . . ."[88]  Utah citizens' ability to enjoy their "inherent and inalienable right to enjoy and defend their lives and liberties" is not contingent upon implementing legislation.

In contrast, the court holds that Article I, § 25 is not self-executing.  This provision states: "This enumeration of rights shall not be construed to impair or deny others retained by the people."[89]  Section 25 is very similar to the Ninth Amendment to the U.S. Constitution, which the court has already held cannot by itself provide the basis for a § 1983 claim.  And § 25 is more of a "general principle or line of policy without" that does not "supply[] the means for putting [it] into effect."[90]  Accordingly, the Jensens' eighth cause of action (based on Article I, § 25) fails to state a claim upon which relief may be granted and must be dismissed.

---

[86]*Id.* at 535 (quoting *Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996)).

[87]*See id.* at 536.

[88]Utah Const. art. I, § 1.

[89]*Id.* art I., § 25.

[90]*Spackman*, 16 P.3d at 535 (quotation marks omitted).

b.      Are Money Damages Available for the Self-Executing Provisions?

Though §§ 1, 7, and 14 of Article I are self-executing, the court must still determine whether damages are appropriate for violations of these sections.  The answer to this question depends on whether the complaint's allegations establish these three elements from *Spackman*: "[f]irst, a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights"; "[s]econd, a plaintiff must establish that existing remedies do not redress his or her injuries"; and "[t]hird, a plaintiff must establish that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[91]

Based on these factors, the court holds that, at this early stage of the litigation, it cannot say with certainty that damages would be inappropriate.  The alleged violations of these sections appear to be "flagrant" and equitable relief was and is "wholly inadequate" to redress these wrongs; *Spackman*'s first and third elements are therefore satisfied.  *Spackman*'s second element, however, is the difficult one.  The Jensens spend considerable time discussing how their state claims differ from their federal claims, but they spend little time demonstrating that existing *remedies*, under § 1983 and other bodies of law, are inadequate to redress the injuries they suffered.  Likewise, the state refers only generally to § 1983 as providing sufficient

---

[91]*Id.* at 538–39.

compensation, not perhaps appreciating that whether the federal cause of action under § 1983 provides sufficient redress for a state constitutional claim is an open question in Utah.[92]

The court is well aware that it must "use [its] common law remedial power cautiously and in favor of existing remedies."[93]  That determination, however, must be made with a precise understanding of the nature of a plaintiff's injuries and the remedies available to address them. The court can have only a general understanding of the plaintiff's injuries at this point in the process, and therefore any firm determination of this issue is premature.  Accordingly, the court denies the motion to dismiss the Jensen's remaining state constitutional law claims, believing that as this litigation progresses the remedies issue will come into clearer focus.

### IV.    The Doctor Defendants' Motion to Dismiss

The Jensens have asserted claims against Dr. Lars Wagner, Dr. David Corwin, Dr. Cheryl Coffin, and Dr. Karen Albritton — doctors at Primary Children's Medical Center — for their role in the events of 2003.  These defendants filed a separate motion to dismiss.  Where the doctor defendants' and State employee defendants' arguments overlap, the court will refer to its earlier discussion.

### A.    Collateral Estoppel

The doctor defendants first argue that the Jensens are estopped from bringing their claims because they were all addressed in the juvenile court proceedings.  In their opening

---

[92]*See Spackman*, 16 P.3d at 538 n.10 ("We do not reach the question of whether existing federal law remedies should preclude a state court from awarding damages for a state constitutional tort.").

[93]*Id.* at 539.

memorandum, the doctors invoked collateral estoppel as the relevant estoppel species.  In the

doctors' reply memorandum, however, collateral estoppel had evolved into judicial estoppel.

A legal theory may not make its first appearance in a reply memorandum.  "A reply

memorandum must be limited to rebuttal of matters raised in the memorandum opposing the

motion . . . ."[94]  And failure to raise an issue in an opening memorandum constitutes waiver of

that issue.[95]  So to the extent judicial estoppel differs from collateral estoppel, the court will

disregard those differences and base its ruling on collateral estoppel only — the issue defendants

raised in their opening memorandum.

Under Utah law, the four elements of collateral estoppel or issue preclusion are:

[1] [T]he party against who issue preclusion is asserted must have been a party to
or in privy with a party to the prior adjudication; [2] the issue decided in the prior
adjudication must be identical to the one presented in the instant action; [3] the
issue in the first action must have been completely, fully, and fairly litigated; and
[4] the first suit must have resulted in a final judgment on the merits.[96]

Since the court at this stage of the proceedings must accept the complaint's allegations as

true, the court finds that juvenile court proceedings in 2003 do not collaterally estop the Jensens'

claims.  Specifically, the second and third elements are not met.  This case concerns whether

events before and during the juvenile court proceedings violated the Jensens' rights under the

Utah and United States Constitutions — issues the juvenile court did not consider.  And the

---

[94]DUCivR 7-1(b)(3).

[95]*See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 n.2 (10th
Cir. 1999); *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994); *Codner
v. United States*, 17 F.3d 1331, 1332 (10th Cir. 1994).

[96]*Brigham Young Univ. v. Tremco Consultants, Inc.*, 110 P.3d 678, 686 (Utah 2005)
(quotation marks omitted).

Jensens' complaint is replete with allegations that the issues were not fairly litigated because of fraud and deceit.  These allegations, which the court must accept as true, prevent a finding that the earlier proceedings were "fully[] and fairly litigated."[97]  The court therefore denies this portion of the doctor defendants' motion to dismiss.

       B.     *The Jensens' § 1983 Claims*

       1.     <u>Substantive Due Process</u>

The doctors characterize the Jensens' complaint as asserting a "right to absolute parental autonomy . . . to raise their child free from any state interference" and argue that the United States Constitution does not protect such a right.  The doctors mischaracterize the Jensens' claim.  The complaint does not, as the doctors assert, allege the right to be *absolutely* free from state interference.  Rather, it seeks to vindicate allegedly unconstitutional deprivations of the Fourteenth Amendment interests identified earlier as the right to familial association and a parent's right to direct the care and upbringing of children. As discussed in above, the Constitution protects these rights, and the complaint's allegations are sufficient to survive a motion to dismiss.

       2.     <u>Substantive Due Process Violations Pleaded as to Each Doctor</u>

The doctors next argue that the complaint fails to state a claim for substantive due process violations against them because their alleged conduct does not "shock the conscience of federal judges."[98]  Based on recent Tenth Circuit precedent, this standard does not apply in this case.

---

[97]*Id.*

[98]Docket No. 18 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1997)).

In *Dubbs v. Head Start, Inc.*, a district court dismissed parents' substantive due process claims (that were very similar to those the Jensens allege here) because the conduct alleged did not "shock the conscience of the court."[99]  The Tenth Circuit reversed, holding that "the district court misapprehended the legal standard applicable to purported substantive due process rights that — like the right to consent to medical treatment for oneself and one's minor children — may be 'objectively, deeply rooted in this Nation's history and tradition.'"[100]  The circuit continued: "While the 'shocks the conscience' standard applies to tortious conduct challenged under the Fourteenth Amendment, it does not exhaust the category of protections under the Supreme Court's substantive due process jurisprudence, or eliminate more categorical protection for 'fundamental rights' as defined by the tradition and experience of the nation."[101]  Though the circuit ultimately "decline[d] to resolve the difficult questions regarding the standard to be applied to this claim because the district court gave only cursory treatment to the parents' substantive due process claims," its discussion strongly indicates that the "shock the conscience" standard does not govern the Jensens' claims.

Rather than applying the "shocks the conscience" standard here, the court takes its cue from the Tenth Circuit's cite to *Washington v. Glucksberg*, which in turn cited *Reno v. Flores* for the proposition that government conduct that infringes upon fundamental liberty interests (such

---

[99]336 F.3d 1194, 1202 (10th Cir. 2003).

[100]*Id.* at 1203 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).

[101]*Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 848–51 (1998)).

as the Jensens' claimed liberty interests here) is unconstitutional "'unless the infringement is narrowly tailored to serve a compelling state interest.'"[102]   The court will apply this standard.

Before reaching the merits, the court acknowledges the seemingly inconsistent standards mandated by *Dubbs* and *Griffin*.   In Section III.D, the court responded to the State employee defendants' motion to dismiss by applying *Griffin*, which mandates a "balancing test" and a hunt for an "undue burden" when liberty interests such as familial association are at issue.[103]   *Dubbs*, in contrast, points to the "narrowly tailored / compelling interest" test for substantive due process rights (such as a parent's right to direct a child's medical care) that "may be 'objectively, deeply rooted in this Nation's history and tradition.'"[104]   The right to enjoy familial association arguably is as deeply rooted in this Nation's history as a parent's right to direct medical care.   So on one level, it makes little sense to assign different tests to these two rights based on labels like "liberty interest" versus "substantive due process right" — particularly where the Tenth Circuit has previously held that the familial right of association is in fact a *subset* of a substantive due process right.[105]

One possible explanation for this apparent discrepancy is that *Glucksberg*'s rule, identified *Dubbs*, that "the Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement

---

[102]*Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

[103]*Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993).

[104]*Dubbs*, 336 F.3d at 1205 (quoting *Glucksberg*, 521 U.S. at 720–21).

[105]*Griffin*, 983 F.2d at 1547.

is narrowly tailored to serve a compelling state interest'"[106] supercedes the balancing test/undue burden requirement from *Griffin*.  Perhaps another explanation is that finding an "undue burden" is equivalent to finding that no compelling state interest exists, or that the State's means were not narrowly tailored.  But this seems unlikely, particularly because the Supreme Court recently applied the narrowly tailored/compelling state interest standard in a substantive due process case[107] despite the existence and applicability of the "undue burden" standard to other substantive due process rights.[108]  If the two tests were identical, the continued distinction would be of no use.

One certainty emerges from this tangled web of apparent substantive due process inconsistencies: this court is not the proper entity to resolve this debate.  The court is bound by Tenth Circuit precedent.  Both *Dubbs* and *Griffin* appear to be good law, so the court will apply two different tests — the balancing test to the motion to dismiss the associational claims, and the narrowly tailored/compelling state interest test to the motion to dismiss the substantive due process claim for invasion of the Jensens' right to direct P.J.'s medical care.

As to the latter, the doctors claim that they did not infringe the Jensens' substantive due process rights because they merely diagnosed P.J.'s condition and reported Mr. and Mrs. Jensen to DCFS as Utah law required after the Jensens failed to enroll their son in chemotherapy.  The Jensens, in turn, accuse the doctors of violating the Jensens' substantive due process rights by,

---

[106]521 U.S. at 721.

[107]*See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 593 (2003).

[108]*Planned Parenthood v. Casey*, 505 U.S. 833, 876–78 (1992).

among other things, misrepresenting P.J.'s condition to the juvenile court, refusing to order specific medical tests that would have conclusively identified P.J.'s cancer, and ignoring or misrepresenting evidence that was inconsistent with their diagnosis.

Since these arguments appear in a motion to dismiss, and since the Jensens have alleged numerous misrepresentations, the court must hold that the Jensens' complaint adequately alleges a substantive due process violation. There is no compelling state interest in falsifying or misrepresenting evidence to a juvenile court. But it should go without saying that this holding assumes the doctors actually did what plaintiffs allege; to survive summary judgment, the Jensens must put forth evidence in support of their claims.

### 3.      P.J.'s Liberty Interests

In Section III.C.1**,** the court held that, under the facts of this case, P.J. had no liberty interest in refusing medical treatment. The court grants this portion of the doctors' motion to dismiss for the same reasons discussed in that section.

### 4.      Procedural Due Process

Like the State employee defendants, the doctor defendants argue that the Jensens fail to state a claim for deprivation of procedural due process. In particular, the doctors argue that the most detailed allegations of procedural due process violations relate to the *State* defendants' actions. They assert that the Jensens' failure to provide specific allegations as to each doctor is fatal to this claim.

The trouble with this argument is that it ignores Tenth Circuit precedent. In *Northington v. Marin*, the circuit discussed tort law principles of joint and several liability and then said,

"[t]hese rules apply in § 1983 actions.  Persons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned."[109]

Here, the complaint implicates all defendants — the State employees and the doctors — in its allegations of constitutional deprivations.  The injuries the Jensens assert as a result of the alleged failure to conduct confirmatory tests and misrepresentations to the Utah court "cannot be apportioned."  This case seems to fit squarely within the rule from *Northington*; as such, the court denies the doctors' motion to dismiss the procedural due process claim.

5.      Ninth Amendment

The doctors, like the State defendants, ask the court to dismiss the Jensens' Ninth Amendment claim.  The court grants this motion for the same reasons outlined in Section III.G above.

6.      Malicious Prosecution

The doctors next ask the court to dismiss the Jensens' § 1983 and state tort malicious prosecution claims because the Jensens' pleas in abeyance preclude them from establishing the "favorable termination" element of these causes of action.  As noted above, it is too early in the proceedings to determine with certainty whether the Jensens' plea agreement was procured by unfair means.  If so, this element may be satisfied.  The court therefore DENIES this motion for the same reasons discussed in Section III.F above.

---

[109]102 F.3d 1564, 1569 (10th Cir. 1996).

D.       *Absolute Immunity*

The doctors claim they are entitled to absolute immunity for all the Jensens' cognizable claims because they "were integral parts of the judicial process"[110] — that is, their actions were allegedly limited to those mandated by law (reporting their diagnosis, P.J.'s condition, and the Jensens' decision to the State) and to participation in the juvenile court proceedings.[111]  The doctors thus seek protection under *Brisco v. LaHue*'s wide grant of "integral" immunity.  The court agrees in part with this assertion.

When deciding whether a defendant is absolutely immune from suit, this court must "apply a 'functional approach . . . which looks to the nature of the function performed, not the identity of the actor who performed it.'"[112]  "'The more distant a function is from the judicial process, the less likely absolute immunity will attach.'"[113]  For this reason, malicious prosecution defendants are not entitled to absolute immunity if they were complaining witnesses — "the person (or persons) who actively instigated or encouraged the prosecution of the plaintiff"[114] — whose "testimony [was] relevant to the manner in which" the plaintiff's prosecution was initiated or perpetrated.[115]

---

[110]*Briscoe v. LaHue*, 460 U.S. 325, 335 (1983).

[111]*See* Docket 18, at 38.

[112]*Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).

[113]*Id.* (quoting *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1999)).

[114]*Anthony v. Baker*, 955 F.2d 1395, 1399 n.2 (10th Cir. 1992).

[115]*Id.* at 1401.

In this case, the complaint alleges that Dr. Wagner's and Dr. Albritton's testimony instigated or encouraged the Jensens' juvenile court case and was relevant to the manner in which those proceedings occurred. The Jensens specifically allege that these doctors did not act in good faith — they allege that Dr. Wagner refused to order tests that would have confirmed the Ewing's sarcoma diagnosis, and that he threatened them by stating, "If you don't come in for treatment, I will take your son." And they allege that Dr. Albritton made several factual misrepresentations and omissions to the juvenile court during the courts of the proceedings. If these facts are true — as the court must assume on this motion to dismiss — these two doctors are not entitled to absolute immunity.

On the other hand, Dr. Corwin and Dr. Coffin did not "initiate or perpetuate the prosecution." Accepting all the facts alleged in the complaint as true, Dr. Corwin attempted to mediate the dispute between the Jensens and PCMC, and Dr. Coffin diagnosed P.J.'s disease. Dr. Corwin and Dr. Coffin are therefore entitled to absolute immunity.

E.    *Qualified Immunity*

The doctors invoke qualified immunity as a separate defense. Since the court has held that Dr. Wagner and Dr. Albritton are not absolutely immune, it will examine whether these two doctors are qualifiedly immune from suit.

As discussed in above, the qualified immunity test consists of two parts: first, do the facts as alleged show the violation of a constitutional right? And second, was that right clearly established?[116] A right is clearly established when its contours are "sufficiently clear that a

---

[116]*See Saucier v. Katz*, 533 U.S. 194, 200 (2001).

reasonable official would know that what he is doing violates that right."[117]  If the answer to either question is "no," the defendant is entitled to qualified immunity.

### 1.     Substantive Due Process

The doctors first claim they are qualifiedly immune from the Jensens' substantive due process claims.  They do not concede the first element but jump directly to the second and argue that the Jensens' alleged constitutional rights were not clearly established.

Rather than skip the first inquiry, the court holds that the facts as alleged here violate the Jensens' Fourteenth Amendment rights for the reasons discussed above.  As to the second element, these rights were clearly established in 2003.  Defendants' arguments to the contrary are misplaced because they focus solely on the Utah law that required them to report instances of suspected abuse or neglect.  But the report itself is not the issue.  Whatever reporting requirements Utah law imposed, the law obviously did not require them to threaten the Jensens, refuse to perform confirmatory tests, or make false, incomplete, or misleading statements to Utah courts, as the Jensens allege they did, with knowledge that these actions would curtail the Jensens' right to direct P.J.'s care and harm their family.  Whether this conduct actually occurred is a vigorously disputed issue of fact to be determined later — the court must accept these allegations as true at this early stage.  And based on these allegations, qualified immunity is inappropriate because the doctors' actions violated clearly established law.

---

[117]*Id.* (quotation marks omitted).

2.      Procedural Due Process

The doctors also argue that they did not violate the Jensens' procedural rights by diagnosing P.J., reporting potential neglect, and testifying in juvenile proceedings. Assuming without deciding that the doctors' position is correct, they again misunderstand the nature of the Jensens' claim, which goes to the fairness of those proceedings.[118] The plaintiffs allege that Dr. Wagner and Dr. Albritton made multiple factual misrepresentations during these events. Such omission or falsehoods would undoubtedly affect the fairness of the proceedings. Based on these alleged facts, qualified immunity is inappropriate.

F.      *Violations of the Utah Constitution*

The doctors next ask the court to dismiss the Jensens' Utah Constitution claims because the provisions allegedly violated "do not substantially differ from their federal counterparts."[119] Their argument is based on *State v. Harris*, where the Utah Supreme Court said, "[w]e acknowledge that as a general rule, we will not engage in a state constitutional analysis unless an argument for different analyses under the state and federal constitution is briefed."[120]

Defendants' argument is misplaced for at least two reasons. First, the sentence in *Harris* immediately following the one quoted above reads: "However, we apply this rule in cases where a party relies nominally on state constitutional provisions while actually relying on the parallel

---

[118]*See supra* Section III.E; *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

[119]Docket No. 18, at 43.

[120]104 P.3d 1250, 1258 (Utah 2004) (brackets and quotation marks omitted).

federal constitutional provisions and analysis based on them."[121]  When drafting their complaint, the Jensens relied equally on the United States and Utah constitutions: four causes of action were based on each.  To this point, then, there has been no "nominal" reliance on the state constitution.

The second problem is related to the first.  Both the Federal Rules of Civil Procedure and their Utah counterparts require only "a short and plain statement of the claim showing that the pleader is entitled to relief."[122]  At this early stage, it would be premature for the court to dismiss the Jensens' state constitutional claims for lack of detailed briefing when the complaint satisfies notice pleading requirements.

That said, the court's holding in response to the State defendants' motion to dismiss — that Article I, § 25 is not self-executing — applies with equal force to the doctors.  The court therefore dismisses the Jensens' eighth cause of action as against the doctors.

G.    *Utah Tort Claims*

Finally, the doctors ask the court to dismiss the Jensens' tort causes of action.  To the extent their arguments overlap with the State defendants', the court denies their motion for the same reasons already discussed.

The doctors also argue a few distinct points.  First, they cite Utah Code Ann. § 63-30-10 for the proposition that the Utah Governmental Immunity Act does not waive immunity for causes of action arising out of "infliction of mental anguish."  This language, which appears in the subsection the doctors cite, must be read in context.  The entire statute reads: "Immunity from

---

[121]*Id.* (brackets and quotation marks omitted).

[122]Fed. R. Civ. P. 8(a); *see also* Utah R. Civ. P. 8(a).

-43-

suit of all *governmental entities* is waived for injury proximately caused by a negligent act or

omission of an employee except if the injury arises out of . . . infliction of mental anguish."[123]

The Act defines a governmental entity as "the state and its political subdivisions as defined in

this chapter."[124]  Thus, by its plain language, the statute does not concern the liability (or

immunity) of individuals such as the doctors, but rather the political subdivisions of the state.

The doctors next argue that the Jensens fail to state a claim for intentional infliction of

emotional distress because they fail to plead that the doctors acted with the "purpose" of

inflicting emotional distress.  Pleading a "purpose" of inflicting emotional distress is one option

for establishing the first element of this cause of action, but a plaintiff may also state a claim by

alleging the defendant "*acted in reckless disregard of the likelihood of causing*[] emotional

distress."[125]  The Jensens' complaint sufficiently alleges "reckless disregard" to survive a Rule

12(b)(6) motion.  And it also adequately alleges the second prong, "outrageous and intolerable"

conduct.[126]  "It is for the court to determine, in the first instance, whether the defendant's conduct

may reasonably be regarded as so extreme and outrageous as to permit recovery."[127]  The court

finds that facts alleged in the complaint satisfy this standard.

---

[123]Utah Code Ann. § 63-30-10(3) (2003).

[124]*Id.* § 63-30-2(3) (2003).

[125]*Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 535 (Utah 2002) (emphasis added).

[126]*Schuurman v. Shingleton*, 26 P.3d 227, 233 (Utah 2001).

[127]*Id.* (brackets and quotation marks omitted).

## V.        Motion to Certify

The final motion before the court is the Jensens' motion to certify the following question

to the Utah Supreme Court:

> Have plaintiffs' Fifth, Sixth, Seventh, and Eighth Causes of Action adequately
> alleged a claim under the Utah state constitution within the meaning of *Spackman
> v. Board of Education*, 2000 UT 87, 16 P.3d 533 (2000)?[128]

Rule 41 of the Utah Rules of Appellate Procedure provides the mechanism by which this

court may certify a question of law to the Utah Supreme Court.  The rule requires this court to

submit a certification order to the Utah Supreme Court that states: (1) the question of law to be

answered; (2) that the question certified is a controlling issue of law in this proceeding; and (3)

that there appears to be no controlling Utah law.[129]

This court may certify a question of law to the Utah Supreme Court, but it need not do so

each time "there is doubt as to local law."[130]  As the Supreme Court has stated:

> In the absence of some recognized public policy or defined principle guiding the
> exercise of the jurisdiction conferred, which would in exceptional cases warrant
> its non-exercise, it has from the first been deemed to be the duty of the federal
> courts, if their jurisdiction is properly invoked, to decide questions of state law
> whenever necessary to the rendition of a judgment.[131]

---

[128]Pls.' Mot. to Certify Question of Law to Utah Supreme Court (Docket No. 32), at 2,
*Jensen v. Utah*, Case No. 2:05-CV-00739 PGC (D. Utah filed Jan. 9, 2006).

[129]Utah R. App. P. 41(c).

[130]*Lehman Bros. v. Schein*, 416 U.S. 386, 390–91 (1974).

[131]*Meredith v. City of Winter Haven*, 320 U.S. 228, 234 (1943).

And the Tenth Circuit has emphasized the Supreme Court's teaching that "'[n]ovel, unsettled questions of state law, however, not "unique circumstances," are necessary before federal courts may avail themselves of state certification procedures.'"[132]

The Jensens' motion comes very early in these proceedings.  At this early point, the court cannot conclude that the question they want certified presents a controlling issue of Utah law — Rule 41(c)'s second element.  And it is unclear whether Rule 41(c)'s third element, an absence of controlling Utah law, is met.  The court therefore denies the Jensens' motion to certify.

**CONCLUSION**

The court GRANTS the State of Utah's motion to dismiss (# 25) and DISMISSES the State as a defendant.  All claims against it fail because of sovereign immunity.

The court GRANTS IN PART and DENIES IN PART the State employees' and doctors' motions to dismiss (# 17, # 23).  The Jensens' fourth cause of action (based on the Ninth Amendment) and eighth cause of action (based on Article I, § 25 of the Utah Constitution) fail to state claims upon which relief may be granted.  The court thus GRANTS defendants' motion and DISMISSES these two claims against all defendants.  The court also GRANTS defendant Richard Anderson's motion to dismiss all claims against him in his official capacity for this same reasons it dismisses the claims against the State of Utah.  The court GRANTS defendants' motion to dismiss P.J.'s malicious prosecution claim against all defendants because he fails to allege that he was prosecuted.  And the court GRANTS defendants' motion to dismiss P.J.'s first

---

[132]*Copier ex rel. Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)).

cause of action because, under the facts of this case, he had no liberty interest in refusing medical treatment.  The court also holds that Dr. Corwin and Dr. Coffin are entitled to absolute immunity; the court therefore GRANTS their motion and DISMISSES all claims against them. The court DENIES the defendants' motions in all other respects.

Finally, the court DENIES the Jensens' motion to certify (# 32) at this early stage of the proceedings.

SO ORDERED.

DATED this 16th day of June, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge