IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| P.J., a minor, by and through his parents and natural guardians, BARBARA and DAREN JENSEN, et al., <br><br> Plaintiffs, <br><br><br><br> vs. <br><br><br> STATE OF UTAH, et al., <br> Defendants. | MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT AND REMANDING STATE LAW CLAIMS <br><br><br><br> Case No. 2:05-CV-739 TS |

This § 1983 case arises from a protracted dispute between Plaintiffs Daren and Barbara Jensen and the State of Utah regarding the proper medical care for their son, Plaintiff P.J. Currently before the Court are the summary judgment motions of Defendants Richard Anderson, Kari Cunningham, Susan Eisenman, Dr. Lars Wagner, and Dr. Karen Albritton. After carefully considering the parties' submissions and having heard oral argument, the Court will grant the summary judgment motions with regard to the Jensens' § 1983 claims for the reasons discussed below. As the Jensens' state law claims involve important issues of Utah law, the Court declines to exercise supplemental jurisdiction and will remand the state claims to the Utah court from which they were removed.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[1]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[2]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[3]

## II.  FACTS

The following is a summary of the factual background in this case, viewed in the light most favorable to the Jensens:  On April 30, 2003, 12-year-old P.J. had a small growth removed from the floor of his mouth by an oral surgeon named Dr. Christensen.  The tissue removed by Dr. Christensen was sent to Laboratory Corporation of America in Kent, Washington for analysis.  LabCorp informed Dr. Christensen that the sample was malignant.  Dr. Christensen then referred P.J. to Dr. Harlan Munz at Primary Children's Medical Center ("PCMC") in Salt Lake City, Utah.

The Jensens met with Dr. Munz on May 9, 2003.  After examining P.J., Dr. Munz referred him to PCMC's oncology department where he met with Dr. Wagner.  Dr. Wagner first

---

[1]See Fed. R. Civ. P. 56(c).

[2]See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[3]See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

met with and examined P.J. that same day, but could not offer any diagnosis until after PCMC's

pathology department completed its own testing.

Upon PCMC's request, LabCorp sent P.J.'s tissue sample to PCMC's pathology

department.  On May 20, 2003, Dr. Lowichik completed the pathology report on P.J.'s tissue,

diagnosing the growth as "EWING SARCOMA/PERIPHERAL PRIMITIVE

NEUROECTODERMAL TUMOR"[4] (*i.e.*, Ewing's Sarcoma).  This diagnosis was rendered

based on immunohistochemical staining and the appearance of the tumor cells.  The pathology

report indicates that P.J.'s "case was reviewed by [fellow pathologist] [Dr. Coffin] who concurs

with this interpretation."[5]  The deposition testimony of the pathologists likewise indicates that

both of them reviewed the testing and were confident in the diagnosis.  Dr. Lowichik estimated

her confidence in the diagnosis to be "in the high 90 percent."[6]  Dr. Coffin reviewed the testing

and was also very confident that the tumor was Ewing's Sarcoma.  In fact, Dr. Coffin testified

that the diagnosis was rendered with near certainty.

In addition to immunohistochemical staining, Ewing's Sarcoma may be diagnosed

through cytogenetic and molecular genetic testing.  Ewing's cells often manifest a chromosomal

translocation (an "11;22 translocation"), which may be detected through these tests.  The

presence of an 11;22 translocation indicates that a specimen is Ewing's Sarcoma.  Cytogenetic

testing may be performed only on fresh or frozen tissue.  Where a tissue sample is placed in

---

[4]Docket No. 345, Ex. 32.

[5]*Id.*

[6]Docket No. 334, Ex. 4, at 31.

formalin or paraffin, cytogenetic testing is not possible.  Although not optimal, molecular testing can be performed on tissues samples that have been placed in formalin or paraffin.

In 2003, PCMC would commonly attempt to conduct cytogenetic testing on sarcoma tissue samples that were excised at PCMC where "there was adequate sample left over after the standard pathology examination."[7]  Molecular testing was available through an affiliated institution.  In 2003, it would not have been unusual for a PCMC pathologist to send samples out for molecular testing to provide further diagnostic information.

Because the tissue removed from P.J.'s mouth by Dr. Christensen was placed in formalin or paraffin, cytogenetic testing could not be performed on that specimen.  There were still tumor cells in P.J.'s mouth, which could have been extracted for this purpose.  However, this would have required further surgery to obtain a sample.  In contrast, molecular testing could have been performed on the tissue sample obtained by Dr. Christensen.

Dr. Wagner discussed the diagnosis of P.J.'s tissue sample with Dr. Coffin.  She told him that she was confident in the diagnosis and that no further testing was needed.  According to Dr. Coffin, where the cell appearance and immunohistochemical staining fit "the criteria for the diagnosis of Ewing's sarcoma," it is not necessary to perform cytogenetic or molecular testing to establish the diagnosis.[8]

On May 21, 2003, Dr. Wagner met with the Jensens for more than an hour.  Dr. Wagner expressed his confidence in the Ewing's Sarcoma diagnosis and explained the need for chemotherapy to begin right away.  Dr. Wagner further explained the difference between

---

[7]Docket No. 345, Ex. 15, at 23.

[8]Docket No. 334, Ex. 3, at 43-44.

localized and non-localized Ewing's Sarcoma.  Specifically, Dr. Wagner informed the Jensens that the cure rate for localized disease—where there is no evidence of cancer in places other than where it was discovered—was approximately 70% when treated with the recommended chemotherapy, but that the cure rate for non-localized (metastatic) disease was as low as 20%. Thus, Dr. Wagner explained the necessity of beginning treatment right away to prevent the cancer from spreading throughout P.J.'s body.

That same day, radiographic examinations were performed on P.J.'s neck, thorax, chest, and skull to determine whether the cancer had spread beyond the floor of P.J.'s mouth.  Each of these tests returned negative.  Ms. Jensen testified that at this point they asked Dr. Wagner "if there was any other test he could run to help confirm that it was Ewing's and he said no."[9]  "He was sure it was Ewing's."[10]

During the May 21, 2003 visit, the Jensens asked Dr. Wagner to have P.J.'s tissue sample sent to the Dana-Farber Cancer Institute at Harvard University for a second opinion.  Dr. Wagner informed the Jensens that insurance companies often would not pay for a second opinion and encouraged them to contact their insurance provider.  Nonetheless, Dr. Wagner agreed to the second opinion and sent the tissue sample to Dana-Farber as requested.  The Jensens ultimately cancelled the Dana-Farber consultation.

The Jensens met with Dr. Wagner again on May 29, 2003.  At this meeting the Jensens asked Dr. Wagner to order a Positron Emission Tomography ("PET") scan.  Dr. Wagner refused to order a PET scan, explaining that it would not be useful in P.J.'s situation because there was

---

[9]Docket No. 345, Ex. 12, at 127.

[10]*Id.* at 134.

no other evidence of metastatic disease.  Dr. Wagner further explained to the Jensens that a

negative PET scan would not change the need for chemotherapy.  The Jensens again asked Dr.

Wagner if there were other tests to confirm the Ewing's diagnosis.  Dr. Wagner said no.

By early June 2003, the Jensens and Dr. Wagner differed significantly in their views

regarding P.J.'s medical care.  Accordingly, a meeting between the Jensens, Dr. Wagner, Dr.

Lemons (head of the oncology department), a PCMC social worker, and PCMC's head of quality

assurance was scheduled for June 9, 2003, at PCMC.  Dr. Wagner again emphasized the need to

begin treating P.J. with chemotherapy right away in order to prevent the cancer from spreading.

The Jensens' statements during the meeting are disputed.  The Jensens contend that they refused

to consent to the proposed chemotherapy based on their desire for further confirmatory tests.  Dr.

Wagner contends that they refused chemotherapy because they wanted to pursue an alternative

treatment called Insulin Potentiation Therapy.  Regardless, the parties were unable to resolve the

impasse.  During the meeting, the PCMC head of quality assurance told the Jensens that a

referral to the Division of Child and Family Services ("DCFS") might be necessary.  The Jensens

left the meeting, telling the PCMC representatives, "You're fired."[11]

At some point, Dr. Corwin of Safe and Healthy Families—a division of PCMC with the

responsibility of ensuring that patients are not left untreated—became involved in P.J.'s case.

Around June 12, 2003, Dr. Corwin attempted to make contact with the Jensens.  Dr. Corwin and

Mr. Jensen had a lengthy telephone conversation on June 15, 2003, but were unable to reach an

agreement as to P.J.'s medical care.  Dr. Corwin and Mr. Jensen unsuccessfully attempted to

schedule a further meeting to discuss the situation.  At that point, the decision was made to refer

---

[11]*Id.*, Ex. 13, at 181.

P.J.'s case to DCFS for medical neglect in refusing what the doctors believed was medically necessary treatment.

On June 16, 2003, a regularly-scheduled meeting was held at PCMC with representatives from DCFS, PCMC, and other community organizations in the child welfare system.  Dr. Wagner and Dr. Corwin were also present.  At this meeting, and in a case summary submitted to DCFS, Dr. Wagner summarized his interaction with the Jensens.  A formal referral to DCFS was made that same day.  The parties dispute whether it was Dr. Corwin or Dr. Wagner who actually submitted the referral.  For purposes of the summary judgment motions, the Court must presume the latter.

DCFS assigned P.J.'s case to Ms. Cunningham, a DCFS social worker.  Dr. Wagner and Dr. Corwin provided Ms. Cunningham with information regarding their understanding of P.J.'s situation, both orally and by written case summaries.  Ms. Cunningham was also present at the June 16, 2003 meeting at PCMC.  Based on communications with Dr. Wagner, Ms. Cunningham was under the impression that P.J.'s situation was a medical emergency and that something needed to be done within a matter of hours or days.

On June 18, 2003, Ms. Cunningham, through Assistant Attorney General Lund,  filed a Verified Petition and Motion to Transfer Custody and Guardianship (the "Verified Petition") in the Third District Juvenile Court for Salt Lake County, Utah (the "Juvenile Court").  Ms. Cunningham filed the Verified Petition based entirely on the information provided to her by Drs. Wagner and Corwin.  She did not do any independent investigation of P.J.'s referral.

On June 20, 2008, the Jensens first appeared before the Juvenile Court.  Ms. Eisenman represented DCFS in place of Ms. Lund and became the primary Assistant Attorney General on P.J.'s case.  At that hearing, the Jensens' attorney, Mr. Frank Mylar, represented that the Jensens

were interested in obtaining further tests of the tissue sample excised by Dr. Christensen.  The

Court continued the hearing until July 10, 2003, as the parties indicated that a stipulation

regarding P.J.'s treatment was possible.

Around this time, the Jensens sought out Dr. Birkmayer, who practiced in Vienna,

Austria.  After reviewing P.J.'s medical records, Dr. Birkmayer indicated to the Jensens that he

was not "totally convinced" that P.J. had Ewing's Sarcoma and that chemotherapy was not

necessary.[12]  The Jensens expressed their desire to have Dr. Birkmayer supervise P.J.'s treatment.

On July 2, 2003, Ms. Eisenman sent an email to Dr. Birkmayer in which she asked questions

regarding, among other things, Dr. Birkmayer's qualifications and licensure and whether Austria

had a standard of care similar to that used by the American Academy of Pediatrics.  After

receiving Ms. Eisenman's email from Dr. Birkmayer, Mr. Mylar instructed Ms. Eisenman not to

contact Dr. Birkmayer directly, but to direct inquiries regarding Dr. Birkmayer to Mr. Mylar.

According to Mr. Jensen, the Jensens abandoned their desire to have Dr. Birkmayer treat P.J. at

that time because DCFS was requiring that P.J.'s medical care be provided by a board-certified

pediatric oncologist.

In late June 2003, Dr. Wagner left Utah to pursue a new job in Ohio.  He informed Ms.

Eisenman that he was leaving and that she could contact Dr. Lemons or Dr. Albritton if she

needed anything.  In preparation for the July 10, 2003 hearing, Ms. Eisenman disclosed to the

Juvenile Court that she intended to prove her case using three medical experts: Drs. Coffin,

Wagner, and Albritton.  In preparation for the hearing, Ms. Eisenman provided Dr. Albritton

---

[12]Docket No. 345, Ex. 48.  Notably, Plaintiffs represent that they submit Dr. Birkmayer's
statements only to illustrate the effect they had on the Jensens' mental state and not for the truth
of the matter asserted.

with materials related to the case, including Dr. Wagner's case summary and a list of questions that might be asked.  Mr. Mylar objected to the introduction of testimony at the July 10, 2003 hearing because the hearing was set for a pre-trial conference and not an evidentiary hearing. The Juvenile Court affirmed the objection and Drs. Albritton and Coffin did not testify at that time.

At the July 10, 2003 hearing, the Jensens again raised the issue of whether P.J. really had Ewing's Sarcoma.  The parties stipulated that the Jensens would have P.J. examined by doctors at the Children's Hospital of Los Angeles ("CHLA") and that the Jensens would abide by their treatment recommendations.  The Juvenile Court set another pretrial conference for July 28, 2003.  Per the stipulation, the Jensens traveled to Los Angeles, where P.J. met with Dr. Tishler on July 21, 2003.  At this meeting, Dr. Tishler informed the Jensens that he was recommending chemotherapy based on the prior pathology tests, but that CHLA would do its own pathology analysis and genetic testing to confirm the Ewing's Sarcoma diagnosis.  The Jensens were unhappy with this result as they believed that Dr. Tishler was not performing an independent evaluation, but was merely deferring to the PCMC doctors.

Based on this dissatisfaction, the Jensens did not return again to CHLA, but instead sought medical care from Dr. Charles Simone.  Dr. Simone initially agreed to treat P.J. However, upon learning of the legal battle in which the Jensens were entrenched, Dr. Simone declined involvement.  Nonetheless, the Jensens believed that Dr. Simone would still agree to treat P.J. if the Juvenile Court would permit it.

At the hearing on July 28, 2003, the Juvenile Court received a report from Dr. Tishler via telephone regarding P.J.'s evaluation at CHLA.  Dr. Tishler indicated that to his knowledge the CHLA testing was not yet complete.  However, he also stated that there was no question that P.J.

9

had a malignant tumor that would require chemotherapy right away and that the remaining

pathological and radiological tests would serve only to clarify what type of tumor he had for

purposes of tailoring the chemotherapy to P.J.'s needs.  The Jensens' new attorney, Mr. Blake

Nakamura, advocated the Jensens' concern that not all of the testing had been completed.

Nonetheless, based on Dr. Tishler's testimony, the Juvenile Court ordered that P.J. commence

chemotherapy before August 8, 2003, without regard to the CHLA test results.  The Juvenile

Court also provided that should the test results indicate that chemotherapy was not needed, the

Jensens were free to bring that fact to the Juvenile Court's attention.

Mr. Nakamura also represented to the Juvenile Court at the July 28 hearing that the

Jensens were not comfortable with Dr. Tishler and would prefer that P.J. be treated by Dr.

Simone.  During the hearing, the Juvenile Court asked Dr. Albritton whether Dr. Simone could

be the primary treating physician.  Dr. Albritton answered:

> No, we wouldn't make him the primary oncologist.  My understanding, in fact, is
> that he is not board certified in oncology, either pediatric or medical oncology.
> He's - from what little I know, he's a specialist in complimentary and alternative
> medicine.  So the gist I get is that he would be asking someone either in Utah or
> L.A. to be prescribing the chemotherapy and then he would be suggesting the
> complimentary approaches that might diminish side effects and so on.  I do not
> think there will be an oncologist in Utah or L.A. who would let him prescribe the
> chemotherapy from New Jersey.[13]

The Juvenile Court also asked Dr. Tishler whether P.J.'s primary treating physician

needed to be a board certified oncologist.  Dr. Tishler answered: "Definitely.  There's no other

physician that could lead the care and provide the care."[14]  Based on this, the Juvenile Court

ordered that P.J.'s primary treating physician be a board certified pediatric oncologist or

---

[13]Docket No. 334, Ex. 33-C, 50-51.

[14]*Id.* at 53-54.

10

hematologist, but that Dr. Simone was authorized to work with P.J.'s other treating physicians. The Court also scheduled an evidentiary hearing on the Verified Petition for August 20, 2003, in the event P.J.'s situation was not yet resolved.

The Jensens never returned to CHLA or PCMC to receive the ordered chemotherapy for P.J. Instead, they sought evaluation at the Burzynski Clinic in Houston, Texas. Around August 6, 2003, the Jensens contacted the Burzynski Clinic to inquiry whether it could treat P.J. On August 7, 2003, an employee of the Burzynski Clinic called the Jensens to indicate that the Clinic was willing to see him. Accordingly, an appointment was set for August 12, 2003.

At this point, the Jensens apparently believed that they did not have to comply with the Juvenile Court's order to begin chemotherapy by August 8, 2003, and that this would only result in the Juvenile Court's holding the August 20, 2003 evidentiary hearing on the Verified Petition. Thus, on August 8, 2003, the Jensens took P.J. and the rest of their children to Bear Lake in Idaho to go boating. From Idaho, they planned to travel to Houston for P.J. to be evaluated at the Burzynski Clinic on August 12.

Having not received confirmation that P.J.'s chemotherapy was underway, Ms. Eisenman sought a hearing with the Juvenile Court on August 8, 2003, for the purpose of seeking authorization to take P.J. into protective custody. Ms. Eisenman called Mr. Nakamura to notify him of her intent to obtain a protective custody order. Present at the August 8, 2003 hearing were Ms. Eisenman, Ms. Cunningham, P.J.'s guardian ad litem, and Mr. Nakamura. Mr. Nakamura participated in the August 8 hearing by telephone. Mr. Nakamura indicated that P.J. was not receiving chemotherapy, that the Jensens did not want to initiate chemotherapy, and that they were taking P.J. to the Burzynski Clinic for evaluation. In response to the disclosure of the Jensens' intent to seek evaluation at the Burzynski Clinic, Ms. Cunningham paged Dr. Albritton,

11

who then participated in the hearing by telephone.  The Juvenile Court and counsel asked Dr.

Albritton whether the Burzynski Clinic was qualified to provide P.J.'s treatment.  Dr. Albritton

indicated that Dr. Burzynski was not a board certified oncologist-hematologist and that his clinic

is known for providing extremely controversial therapy.  Dr. Albritton further indicated that she

was unaware of any pediatric oncologists at the Burzynski Clinic, but would need more time to

confirm that fact.  Finally, Dr. Albritton testified that the Burzynski Clinic was not an

appropriate option for a newly-diagnosed cancer patient who had not exhausted standard

treatment options.

      Ms. Eisenman then filed an Application to Take a Child Into Protective Custody.  This

application was supported by an affidavit signed by Ms. Cunningham on August 8, 2003.

Attached to Ms. Cunningham's affidavit was an affidavit executed by Dr. Wagner on July 22,

2003.  The Juvenile Court signed an order authorizing DCFS to take P.J. into protective custody,

finding that it was in P.J.'s best interest.  Ms. Eisenman enlisted the help of Sandy City Police

Officer Peterson, whom she had contacted earlier that day, to help serve the warrant.  Officer

Peterson was unable to serve the warrant because the Jensens had already left for Bear Lake

earlier that day.

      Mr. Nakamura informed the Jensens that the Juvenile Court had signed a "pickup order"

and that P.J. was to be placed in DCFS custody to begin chemotherapy.  Despite this, the Jensens

decided to stay in Idaho and seek an independent opinion of P.J.'s condition in preparation for

the evidentiary hearing scheduled for August 20, 2003.

      On August 13, 2003, P.J.'s guardian ad litem filed a motion for an order to show cause.

After hearing the motion that same day, the Juvenile Court entered a bench warrant for the

Jensens' arrest and ordered them to appear and present P.J.  However, a Juvenile Court clerk told

Ms. Eisenman and P.J.'s guardian ad litem that a Juvenile Court warrant would not be placed on

a national database, which would require an adult warrant.  Perhaps recognizing this, Ms.

Eisenman announced to the Jensens' attorneys and P.J.'s guardian ad litem that if the Jensens did

not cooperate with the Juvenile Court orders, she would have to go to local and federal law

enforcement authorities.

     Based on information provided by Ms. Eisenman to Officer Peterson, the Salt Lake

County District Attorney's Office agreed to screen the Jensen matter for criminal charges on

August 15, 2003.  Ms. Eisenman, Ms. Cunningham, and P.J.'s guardian ad litem attended the

August 15 screening.  That same day, the District Attorney's Office filed criminal charges

against the Jensens, including one count of custodial interference and one count of kidnaping.

     On August 16, 2003, Mr. Jensen was arrested in Idaho where he spent four days in jail

before he was released on bail.  Upon Mr. Jensen's arrest, Ms. Jensen left Idaho and took P.J. to

Houston in an attempt to meet with the Burzynski Clinic.  However, the Burzynski Clinic refused

to see P.J. because Ms. Eisenman and P.J.'s guardian ad litem informed the clinic that the State

had been granted protective custody over P.J. and did not consent to his treatment.

     The Juvenile Court held a non-evidentiary hearing on August 20, 2003.  In that hearing,

Mr. Nakamura read a letter written by Mr. Jensen and explained that the Jensens wished to have

an opportunity to present evidence.  The Juvenile Court agreed to set an evidentiary hearing, but

refused to lift the warrants.

     Shortly after this hearing, Ms. Eisenman assumed a new position in the Attorney

General's Office and no longer participated in P.J.'s case.  Additionally, Mr. Anderson, Director

of DCFS, was asked by a representative of Utah's Governor to personally assist in negotiating a

resolution to P.J.'s case.  Accordingly, on August 27, 2003, Mr. Anderson flew to Idaho to meet

with the Jensens where negotiations continued for several days.

On September 5, 2003, the parties entered into a stipulation in which the Jensens agreed

to submit P.J. to the care of Dr. Johnston—a board-certified pediatric oncologist—of St. Luke's

Hospital in Boise, Idaho, and to abide by his treatment recommendations.  DCFS agreed to ask

the Juvenile Court to return full custody of P.J. to the Jensens and to vacate the warrants.  After

receiving assurances that the Jensens would submit to chemotherapy if Dr. Johnston

recommended it, the Juvenile Court approved the stipulation.

After performing his evaluation, Dr. Johnston concluded that P.J. needed chemotherapy.

The Jensens again refused to submit P.J. to chemotherapy, claiming that Dr. Johnston was

merely rubber-stamping the diagnosis of the PCMC doctors.  Mr. Jensen told Dr. Johnston that if

P.J. ever did receive chemotherapy at St. Luke's, he would "make sure it's a hellish experience

for everybody involved."[15]

Another hearing was held in the Juvenile Court on October 8, 2003.  At the October 8

hearing, Dr. Johnston testified that he had confirmed P.J. had Ewing's Sarcoma and that the

Jensens had rejected his recommendation that P.J. undergo chemotherapy.  Assistant Attorney

General Mark May, who replaced Ms. Eisenman on P.J.'s case, indicated that the parties would

attempt to reach a settlement.

Having determined that the Jensens would not submit P.J. to chemotherapy under any

circumstances, DCFS filed a Motion to Dismiss Verified Petition on October 22, 2003.  In its

Motion, DCFS stated that its decision to dismiss the Verified Petition was made with full

---

[15]Docket No. 344, Ex. 11, at 700-01.

recognition that without chemotherapy P.J.'s chances of survival would fall dramatically. Nonetheless, DCFS concluded that it was simply unworkable to attempt to force a 13-year-old boy to undergo chemotherapy unwillingly.

On October 2, 2003, the Jensens entered a plea agreement with the State on the criminal charges. The Jensens agreed to enter a guilty plea and abeyance on the custodial interference charge in exchange for the State's promise to dismiss the kidnaping charge.

## III.  DISCUSSION

In July 2005, the Jensens filed a Complaint in the Third Judicial District Court for Salt Lake County, Utah, against the State of Utah, Intermountain Health Care, Inc., Ms. Cunningham, Mr. Anderson, Dr. Wagner, Dr. Corwin, Dr. Coffin, Dr. Albritton, and Ms. Eisenman. In their Complaint, the Jensens allege the following causes of action: (1) § 1983 - violation of the substantive due process right to direct medical care (2) § 1983 - violation of the substantive due process right to familial association;[16] (3) § 1983 - malicious prosecution under the Fourth

---

[16]In their Complaint, the Jensens allege that Defendants violated their right to familial association under both the First Amendment and the Due Process Clause of the Fourteenth Amendment. However, in the Tenth Circuit "the familial right of association is properly based on the 'concept of liberty in the Fourteenth Amendment.'" *Griffen v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993). The Court recognizes that the Tenth Circuit has, in dictum, recognized a First Amendment right "to enter into and maintain certain intimate or private relationships." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 358 (10th Cir. 2006) (dealing with expressive association). Nonetheless, the Tenth Circuit has consistently analyzed familial association claims within the substantive due process framework, even in cases subsequent to the *Grace United Methodist Church* case. *See Estate of Herring v. City of Colorado Springs*, 233 Fed. Appx. 854, 856 (10th Cir. May 18, 2007) (recognizing that "the familial right of association is grounded in the Fourteenth Amendment concept of liberty") (unpublished decision); *Suasnavas v. Stover*, 196 Fed. Appx. 647, 654 (10th Cir. Aug. 25, 2006) ("The right of familial association is a substantive due process right . . . .") (unpublished decision); *Chatwin v. Barlow*, 2008 WL 501109, at *4 (D. Utah Feb. 20, 2008) ("The Tenth Circuit has recognized that the freedom of familial association is a substantive right guaranteed by the due process clause of the Fourteenth Amendment.") (unpublished decision). Based on the long line of cases employing the standards set forth in *Griffen*, the Court finds that the Jensens'

Amendment; (4) § 1983 - violation of the Ninth Amendment; (5) violation of article I, section 1 of the Utah Constitution; (6) violation of article I, section 7 of the Utah Constitution; (7) violation of article I, section 14 of the Utah Constitution; (8) violation of article I, section 25 of the Utah Constitution; (9) wrongful initiation; and (10) intentional infliction of emotional distress.

After removing the case to this Court, the Defendants filed motions to dismiss.  In an Order dated June 16, 2006, the Court dismissed the State of Utah on the basis of sovereign immunity and Drs. Corwin and Coffin on the basis of absolute immunity.  The Court also dismissed the fourth and eighth causes of action in their entirety and the first and third causes of action to the extent they were asserted by P.J.  IHC has since been voluntarily dismissed.

After the close of discovery on the issue of liability, Mr. Anderson, Ms. Cunningham, Ms. Eisenman, Dr. Wagner, and Dr. Albritton filed the motions presently before the Court, arguing that they are entitled to summary judgment on Plaintiffs' federal claims based on the *Rooker-Feldman* Doctrine, absolute immunity, and qualified immunity.

A. The *Rooker-Feldman* Doctrine

"*Rooker-Feldman* precludes federal district courts from effectively exercising appellate jurisdiction over claims 'actually decided by a state court' and claims 'inextricably intertwined' with a prior state-court judgment."[17]  The doctrine arises from 28 U.S.C. § 1257(a), which allows

---

familial association claims arise from and are appropriately analyzed under Due Process Clause of the Fourteenth Amendment.

[17]*Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006) (quoting *Kenmen Eng'g v. City of Union*, 314 F.3d 468, 473 (10th Cir. 2002)) (internal quotation marks omitted).

review of state-court judgments by the United States Supreme Court and, by negative inference, precludes lower federal courts from exercising such jurisdiction.[18]

Noting that the doctrine had, at times, been applied by lower courts far beyond its original contours, the Supreme Court declared in the case of *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,[19] that application of the *Rooker-Feldman* doctrine is limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."[20]  The Tenth Circuit summarized the *Exxon Mobil* holding as follows:

> As the Supreme Court emphasized in *Exxon Mobil*, the *Rooker-Feldman* doctrine does not apply "simply because a party attempts to litigate in federal court a matter previously litigated in state court."  To the contrary, a party may lose in state court and then raise precisely the same legal issues in federal court, so long as the *relief sought* in the federal action would not reverse or undo the *relief granted* by the state court: "if a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction . . . .'"[21]

Accordingly, *Rooker-Feldman* applies only where the relief sought in the federal case would "reverse or undo the state court judgment."[22]

*Rooker-Feldman* has been applied to constitutional claims arising from child custody proceedings in state courts.  For example, in *Warnick v. Briggs*,[23] this Court applied the doctrine

---

[18]*Id.*

[19]544 U.S. 280 (2005).

[20]*Id.* at 284.

[21]*Mo's Express*, 441 F.3d at 1237 (quoting *Exxon Mobil*, 544 U.S. at 292-94).

[22]*Id.*

[23]2007 WL 3231609 (D. Utah Oct. 30, 2007).

to a § 1983 claim alleging various constitutional violations against several state actors, seeking review of the circumstances surrounding the removal of the plaintiff's child by the state without a pre-removal hearing.[24]  The Court found that "if it adjudicated Plaintiffs' claims relating to [the child's] removal, [it] would effectively act as an appellate court in reviewing the juvenile court's disposition."[25]  Applying *Rooker-Feldman* in that situation made sense as the juvenile court heard and decided the issue of whether the circumstances justified the child's removal, and the plaintiff did not challenge the "integrity of the evidence" before the juvenile court.[26]

However, where a plaintiff's federal cause of action is for injury sustained as a result of actions taken during the course of the custody proceedings that are separate from the judgments of the state court, *Rooker-Feldman* does not apply.  The case of *Brokaw v. Weaver*[27] of the Seventh Circuit is particularly persuasive on this point and is closely analogous to the Jensens' case.  In *Brokaw*, the plaintiff was removed from her parents and placed in state custody by order of a state court after a social worker and others fabricated a charge of child neglect.[28] Subsequently, another state court found no continuing basis to hold the plaintiff in state custody and released her to her parents.[29]  Years later, after reaching the age of majority, the plaintiff brought suit in federal court against the social worker and the others who made up the neglect

---

[24]*Id.* at *9-10.

[25]*Id.* at *10.

[26]*Id.*

[27]305 F.3d 660 (7th Cir. 2002).

[28]*Id.* at 662.

[29]*Id.* at 663.

charges, alleging violations of her right to familial relations under substantive due process, violation of the Fourth Amendment in her removal, and violation of procedural due process.[30] The district court dismissed the case based on application of the *Rooker-Feldman* doctrine.

The Seventh Circuit reversed, finding that the actions of the defendants "violated her constitutional rights, independently of the state court decision."[31]  The court recognized that the plaintiff's injuries would not have happened without the state court's order directing her removal and placing her in state custody.  Nonetheless, the court found that the plaintiff's claims were independent of the state court judgments, emphasizing that even if the plaintiff "would not have suffered any damages absent the state order . . . her claim for damages [was] based on an alleged independent violation of her constitutional rights.  It was this separate constitutional violation which caused the adverse state court decision."[32]  Thus, the true cause of the plaintiff's injuries was the defendant's actions, even though the injuries would not have occurred absent the state court's order.[33]

In this case, the Court finds that the *Rooker-Feldman* doctrine does not apply to the Jensens' claims, as they seek relief independent from any judgements rendered by the state courts.  The Jensens do not seek to reverse or undo any judgments of the state courts.  After all, the Verified Petition was ultimately dismissed and full custody of P.J. returned to the Jensens.

---

[30]*Id.*

[31]*Id.* at 665.

[32]*Id.* at 667; *see also Holloway v. Borsh*, 220 F.3d 767, 778-79 (6th Cir. 2000) (finding § 1983 suit against caseworker independent of state custody proceedings based on actions taken by the caseworker during the course of the state proceedings).

[33]*Brokaw*, 305 F.3d at 667.

Rather, the Jensens' claims are based on the separate conduct of the Defendants previous to and during the course of the proceedings in the state courts. Although the Juvenile Court was surely called upon to balance the parental rights of the Jensens with the State's interest in protecting P.J.'s welfare, nothing in the record indicates that either the Juvenile Court or the state criminal court heard and ruled on claims that the Defendants deliberately misrepresented and omitted material facts to the state courts, to each other, to the District Attorney's Office, or others involved in the events surrounding P.J.'s medical care in 2003.

Thus, the Jensens allege independent claims similar to those in the *Brokaw* case. Although much of the injury alleged by the Jensens would not have resulted in the absence of the Juvenile Court's orders, the Jensens argue that the underlying cause of those orders was the Defendants' factual misrepresentations and omissions. The Jensens' claims are different from those in the *Warnick* case, where the state court entered specific findings of fact on the very events complained of by the plaintiffs and where there was no challenge to the integrity of the evidence. It is true that granting relief to the Jensens in this case might require the Court to enter findings that contradict issues decided by the state court. However, this does not, of itself, invoke the *Rooker-Feldman* doctrine.[34] Thus, the constitutional injury alleged by the Jensens is separate and independent from any orders of the state courts, precluding application of the *Rooker-Feldman* doctrine.

It must be noted, however, that the Jensens' claims are properly before this Court only to the extent that they allege the Defendants engaged in conduct that was not brought before the Juvenile Court or conduct that materially affected the integrity of the evidence on which the

---

[34]*Mo's Express*, 441 F.3d at 1237.

20

Juvenile Court relied.  It is not for this Court to decide whether P.J. actually had Ewing's

Sarcoma or whether the Juvenile Court properly balanced the State's interest in protecting

children and the Jensens' constitutional rights.  Those issues, and other similar matters, were

squarely ruled on by the Juvenile Court and could only be properly challenged by the Jensens

through an appeal.

B.  Absolute Immunity

"The Supreme Court has recognized the defense of absolute immunity from civil rights

suits in several well-established contexts involving the judicial process."[35]  "[S]tate attorneys and

agency officials who perform functions analogous to those of a prosecutor in initiating and

pursuing civil and administrative enforcement proceedings are absolutely immune from suit

under section 1983 concerning activities intimately associated with the judicial . . . process."[36]

The Tenth Circuit has recognized that social workers are entitled to absolute immunity when they

meet this criteria.[37]

The Court applies a "functional approach" to determine whether activities are sufficiently

connected with the judicial process to merit absolute immunity.[38]  A prosecutor is entitled to

absolute prosecutorial immunity "when performing the traditional functions of an advocate."[39]

Thus, a prosecutor enjoys absolute immunity even when he or she is accused of making

---

[35]*Snell v. Tunnell*, 920 F.2d 673, 686 (10th Cir. 1990).

[36]*Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000) (quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1990)) (internal quotation marks omitted).

[37]*Snell*, 920 F.2d at 687-91 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).

[38]*Id.* at 686.

[39]*Kalina v. Fletcher*, 522 U.S. 118, 131 (1997).

21

misrepresentations to the court, as long as the actions were taken in the role of an advocate.[40] "However, absolute immunity does not extend to actions 'that are primarily investigative or administrative in nature,' though it 'may attach even to such administrative or investigative activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.'"[41]

As a general rule, witnesses who testify in a judicial proceeding, whether during trial or before, are likewise entitled to absolute immunity from suit arising from their testimony.[42] However, absolute witness immunity is not available to "complaining witnesses"—"the person (or persons) who actively instigated or encouraged the prosecution of the plaintiff"—for testimony "that is relevant to the manner in which the complaining witness initiated or perpetuated the prosecution."[43]

As explained below, the Court finds that Ms. Eisenman and Dr. Albritton are absolutely immune from all of the Jensens' § 1983 claims. Ms. Cunningham is likewise entitled to absolute immunity with regard to her decision to file the Verified Petition, but is not so entitled with regard to the rest of the conduct alleged in the Jensens' Complaint.

Ms. Eisenman. Ms. Eisenman argues that she is absolutely immune from the Jensens' claims arising from functions performed in her role as an advocate or in fulfillment of her duties as an officer of the Juvenile Court. The Jensens claim that Ms. Eisenman engaged in a number

---

[40]*Imbler*, 424 U.S. at 430-31 & n.34.

[41]*Scott*, 216 F.3d at 908 (quoting *Pfeiffer*, 929 F.2d at 1490) (internal quotation marks omitted).

[42]*Anthony v. Baker*, 955 F.2d 1395, 1400 (10th Cir. 1992).

[43]*Id.* at 1399 n.2, 1402.

of harmful activities outside the scope of her advocate role, which are grouped as follows for purposes of analysis: (1)  factual misrepresentations and omissions made to the Juvenile Court; (2) misrepresentations to Ms. Cunningham, Mr. Anderson, and Utah Attorney General Shurtleff;[44] (3) factual misrepresentations and omissions made to the District Attorney's Office; and (4) other investigative activities.  Additionally, although not discussed by the Jensens, Ms. Eisenman contends that she is immune from claims arising from the August 2003 letter to the Burzynski Clinic in which Ms. Eisenman informed the Clinic of the custody order and forbade the clinic from providing any treatment to P.J.  The Court finds that Ms. Eisenman is entitled to absolute immunity with respect to all of the Jensens § 1983 claims.

Ms. Eisenman is absolutely immune with regard to the first group—misrepresentations made to the Juvenile Court.  Even assuming that Ms. Eisenman intentionally misrepresented facts to the Juvenile Court, those misrepresentations were made in her role as an advocate.  There is no evidence that any of the alleged misrepresentations were made under oath or as a witness.

The Court likewise finds that Ms. Eisenman is entitled to absolute immunity with regard to the second group—misrepresentations to others involved in the Juvenile Court proceedings. Ms. Eisenman's communications with these persons were all directly related to the Juvenile Court proceedings.  Ms. Cunningham and Mr. Anderson from DCFS were Ms. Eisenman's clients.  Attorney General Shurtleff was Ms. Eisenman's co-prosecutor, whose name was on the Juvenile Court pleadings.  The parties have not cited, nor has additional research uncovered, any cases dealing with the question of whether a prosecutor is entitled to absolute immunity for communications with her clients and co-counsel.  Nonetheless, these communications are

---

[44]The Jensens also claim that a misrepresentation was made to the Guardian ad Litem, but offer no citation to evidence that would support this assertion.

directly related to a prosecutor's ability to present the State's case, satisfying the guiding principle of prosecutorial immunity—proximity to the "judicial process and the initiation and presentation of the state's case."[45]  A prosecutor must be able to freely speak with her client—the very person for whom he is advocating—and the other prosecutors assigned to the case without fear that their communications may later form the basis of a civil suit.  These communications likely include discussions of, among other things, trial preparation and strategy, discussion of applicable law, as well as plea and settlement opportunities.  Allowing claims to proceed against a prosecutor based on information shared (or not shared) during the course of discussions with his client and/or his fellow prosecutor would interfere with the prosecutor's ability to present the State's case.[46]  Thus, the public policy behind the prosecutorial privilege—"to allow functionaries in the judicial system the latitude to perform their tasks absent the threat of retaliatory litigation"[47]—fully supports Ms. Eisenman's entitlement to absolute immunity with regard to her communications with Ms. Cunningham, Mr. Anderson, and Attorney General Shurtleff.

        The Court also finds that Ms. Eisenman is entitled to absolute immunity with regard to the third category—misrepresentations made to the District Attorney.  The Jensens have submitted sufficient evidence to show that Ms. Eisenman provided the District Attorney's Office with factual information that led to the criminal charges against the Jensens.  In the absence of other considerations, this would render Ms. Eisenman a complaining witness, absolving her of

---

[45]*Scott*, 216 F.3d at 908.

[46]*Id.*

[47]*Snell*, 920 F.2d at 686-87.

24

prosecutorial immunity with regard to the criminal case.[48]  However, the Juvenile Court had ordered that DCFS take protective custody of P.J.  Despite being apprised by their attorney of the Juvenile Court's custody order, the Jensens refused to return to Utah and produce P.J.  Seeking to effectuate the Juvenile Court's order, Ms. Eisenman provided information to the District Attorney's office which led to the initiation of criminal charges.  It is clear to this Court that these actions were intimately connected with her duties to the Juvenile Court.[49]  For these same reasons, Ms. Eisenman's actions in drafting and sending the August 2003 letter to the Burzynski Clinic were also intimately connected with the Juvenile Court proceedings.  Accordingly, the Court finds that Ms. Eisenman is entitled to absolute immunity with respect to the Jensens' claims related to her providing allegedly misleading information to the District Attorney's Office and to her drafting and sending the August 2003 letter to the Burzynski Clinic.

With regard to the fourth grouping—investigative activities—the Jensens point to two examples of investigative activities engaged in by Ms. Eisenman: (1) providing documents to Dr. Albritton in advance of a July 10, 2003 hearing; and (2) sending an email to Dr. Birkmayer in which she made false representations regarding the standard of care for Ewing's Sarcoma treatment.  Concerning the former, the Jensens do not show how providing documents to a witness in the course of preparing for a hearing is investigative.  With respect to the latter, the Jensens offer the following evidence in support of their assertion that Ms. Eisenman discovered the standard mentioned in the email to Dr. Birkmayer through her own investigative efforts: (1)

---

[48]*Kalina*, 522 U.S. at 129-31.

[49]*Cf. Burrows v. Cherokee County Sheriff's Office*, 38 Fed. Appx. 504, 506 (10th Cir. Mar. 19, 2002) (granting immunity to prosecutor for his actions in seeking extradition order) (unpublished decision).

Ms. Eisenman testified that she could not remember where she got the document containing the referenced standard; (2) that Dr. Wagner testified that he did not give it to her; and (3) that P.J.'s guardian ad litem did not recognize the document.  Even when viewed in the light most favorable to the Jensens, this testimony does not permit an inference that Ms. Eisenman obtained the document through her own investigative efforts.  A number of doctors participated in DCFS's involvement with P.J.'s situation—including Drs. Lemons and Albritton, both pediatric oncologists—any one of whom might have provided this information to Ms. Eisenman. Therefore, the Court concludes that Ms. Eisenman is absolutely immune from these claims, which are directly related to Ms. Eisenman's efforts to marshal the evidence and prepare for witness examination.

        Dr. Albritton.  The Jensens' claims against Dr. Albritton are based on the following allegations: (1) that Dr. Albritton stated to Ms. Eisenman, Ms. McDonald, and the Juvenile Court that only a board-certified pediatric oncologist was qualified to treat P.J.; (2) that Dr. Albritton misrepresented the qualifications and services of the Burzynski Clinic to the Juvenile Court; and (3) that Dr. Albritton failed to disclose to the Juvenile Court and others that genetic testing was routinely conducted at PCMC on cases of suspected Ewing's Sarcoma.[50]  Each of these allegations are directly tied to Dr. Albritton's role as an expert witness in which she opined as to the medical care required by P.J. and what doctors and facilities were capable of providing it.

---

[50]In opposing absolute immunity, the Jensens also point to circumstantial evidence that they claims shows Dr. Albritton provided false information to Dr. Johnston.  The Jensens argue that this makes Dr. Albritton a complaining witness.  However, nowhere in their briefs do the Jensens rely on this evidence to support their constitutional claims.  The Jensens make no effort to show how Dr. Albritton's alleged conversation with Dr. Johnston violated their constitutional rights.

This was precisely what Dr. Albritton was subpoenaed to testify about.  Accordingly, the Court finds that Dr. Albritton is entitled to absolute immunity from the Jensens' § 1983 claims.

Ms. Cunningham.  The Jensens base their § 1983 claims against Ms. Cunningham on her failure to investigate P.J.'s referral before filing the Verified Petition and on the factual misrepresentations she allegedly made to the Juvenile Court.  Ms. Cunningham contends that she is absolutely immune from each of the claims asserted by the Jensens because she performed only prosecutorial functions.

The Court finds that Ms. Cunningham is entitled to absolute immunity, but only with regard to her decision to file the Verified Petition.  The Verified Petition was filed with an accompanying "Verification" in which Ms. Cunningham swore under oath that the "matters stated [in the Petition] are true."[51]  Although Ms. Cunningham surely exercised prosecutorial discretion in electing to file the petition, she acted outside the scope of any prosecutorial function by attesting under oath to the allegations in the Verified Petition as a complaining witness.[52]  Thus, although Ms. Cunningham is entitled to absolute immunity for her decision to file the Verified Petition, she is not immune from the Jensens' claims based their contention that the Verified Petition contained misrepresentations and omissions.  For the same reasons, Ms. Cunningham is not immune from the Jensen's claims arising from the submission of her August 2003 affidavits, which the Jensens claim contained factual misrepresentations and omissions.

Finally, Ms. Cunningham is not absolutely immune from the Jensens' claims arising from her alleged failure to properly investigate P.J.'s referral because this duty did not sufficiently

---

[51] Verified Petition, Docket No. 345, Ex. 43, at 6.

[52] *Kalina*, 522 U.S. at 129-31.

relate to the judicial proceedings.  Certainly, prosecutorial immunity may be had for actions in "obtaining, reviewing and evaluating evidence" prior to initiation of a criminal action.[53] However, this is because these investigative actions "are necessary so that a prosecutor may fulfill his function as an officer of the court."[54]  Although a judicial proceeding might result from its fulfillment, Ms. Cunningham's duty to investigate reports of child neglect is for the purpose of protecting the children who are the subject of those reports.[55]  Therefore, it cannot be said that fulfillment of this duty is intimately associated with the judicial process.  Accordingly, the Court will deny Ms. Cunningham's request for summary judgment based on absolute immunity.

C.  Qualified Immunity

Each of the Defendants also asserts qualified immunity with respect to the Jensens' § 1983 claims.  Where a state actor raises a qualified immunity defense in a motion for summary judgment, "the burden shifts to the plaintiff to satisfy a strict two-part test: first, the plaintiff must show that the defendant's actions violated a constitutional or statutory right; second, the plaintiff must show that this right was clearly established at the time of the conduct at issue."[56]  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."[57]

---

[53]*Snell*, 920 F.2d at 693.

[54]*Id.*

[55]Utah Code Ann. § 62A-4a-409.

[56]*Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000).

[57]*Id.*

A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation."[58]  This determination must be made "in light of the specific context of the case, not as a broad general proposition."[59]  That a right was clearly established can be shown by controlling case law in the Tenth Circuit or by the weight of authority in other circuits.[60]  Notably, though, the Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[61]

In their § 1983 claims, the Jensens allege that Defendants violated their substantive due process rights and their rights to be free from unreasonable searches and seizures.

    1.  Substantive Due Process

In their first and second causes of action, the Jensens[62] claim that each of the Defendants engaged in substantive due process violations of the Jensens' rights to familial association and to direct P.J.'s medical care.

The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law."[63]  In addition to procedural protections, the Due Process Clause also provides two forms of "substantive" protection: (1) protection against

---

[58]*Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

[59]*Id.* (quoting *Katz*, 533 U.S. at 201).

[60]*Id.* at 1114-15.

[61]*Id.* at 1115 (quoting *Hope v. Peizer*, 536 U.S. 730, 741 (2002)).

[62]In its June 2006 Order, the Court dismissed P.J.'s claims for violation of his right to refuse unwanted treatment.  Thus, P.J. proceeds only on his familial association claim.

[63]U.S. Const. Amend. XIV § 1.

29

government action that "shocks the conscience" and (2) protection of fundamental liberty interests.[64]  In the case of *Seegmiller v. Laverkin City*, the Tenth Circuit recently clarified that these two "strands of the substantive due process doctrine" are not mutually exclusive.[65]  Rather, "by satisfying either the 'fundamental right' or the 'shocks the conscience' standards, a plaintiff states a valid substantive due process claim."[66]  The *Seegmiller* court admonished: "Courts should not unilaterally choose to consider only one or the other of the two strands.  Both approaches may well be applied in any given case."[67]

A substantive due process claim based on arbitrary and oppressive government action is established where the conduct in question is so egregious that it "shocks the conscience of federal judges."[68]  Mere negligence is clearly insufficient to meet this standard.[69]  For that matter, even an intentional or reckless abuse of power that causes the plaintiff injury does not, of itself, meet the "shocks the conscience" standard.[70]  Rather, there must be "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."[71]

---

[64]*Seegmiller v. Laverkin City*, 528 F.3d 762, 767 (10th Cir. 2008).

[65]*Id.* at 767, 769.

[66]*Id.* at 767.

[67]*Id.* at 769.

[68]*Ward v. Anderson*, 494 F.3d 929, 938 (10th Cir. 2007) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006)) (internal quotations marks omitted).

[69]*Id.* at 937.

[70]*Id.* at 937-38.

[71]*Id.* at 938.

A substantive due process plaintiff asserting a fundamental liberty interest must narrowly articulate its scope.[72]  The Court must then determine whether the asserted interest is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."[73]  Should both of these hurdles be cleared, the plaintiff must then show that the government actor's conduct infringed on the plaintiff's fundamental liberty interest and was "not narrowly tailored to serve a compelling state interest."[74]

The Jensens claim that Defendants infringed on their right to direct P.J.'s medical care and their right to familial association.  The Supreme Court has recognized that the Due Process Clause "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[75]  This "fundamental right" encompasses both of the liberty interests asserted by the Jensens, calling for application of the compelling interest/narrowly tailored standard.  In *Dubbs v. Head Start, Inc.*,[76] the Tenth Circuit reversed a district court for applying the "shocks the conscience" standard to the substantive due process claims of two parents against the state for infringing on their right to direct the medical care of their children.[77]

---

[72]*Seegmiller*, 528 F.3d at 769 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

[73]*Id.* (quoting *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003)) (internal quotation marks omitted).

[74]*Seegmiller*, 528 F.3d at 767.

[75]*Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion).

[76]336 F.3d 1194 (10th Cir. 2003).

[77]*Id.* at 1202-03.

Although it ultimately declined to delineate the applicable standard due to the scant record before it, the court included a parent's right to direct the medical care of his or her children among those fundamental rights for which a substantive due process claim may be stated without meeting the "shocks the conscience" standard.[78]

Dr. Wagner contends that the Jensens have not narrowly articulated their right to direct P.J.'s medical care and, therefore, are not entitled to application of the compelling interest/narrowly tailored standard. More specifically, Dr. Wagner argues that the Jensens' claim to absolute autonomy in directing the medical care decisions of their son conflicts with the "'Constitution's notions of ordered liberty,' which have always protected a child's right to treatment whenever it has been unreasonably denied by a parent."[79] The Court agrees with this general proposition. However, with a few notable exceptions that are discussed below, the Court does not read the Jensens' claimed right so broadly. The Jensens do not claim a right to direct P.J.'s medical care free of *any* State interference. Rather, they claim that the State cannot interfere with their right to direct P.J.'s medical care by making deliberate and material factual misrepresentations and omissions to state courts and other decision makers during the process by which that interference is accomplished. As the Court recognized in its June 2006 Order, when the Jensens' right to direct P.J.'s medical care is placed in this context, it is not only fundamental, but is also clearly established.[80]

---

[78] *Id.*

[79] Docket No. 381, at 2.

[80] Docket No. 52, at 22, 34, 41 (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1297-99 (10th Cir. 2004); *Dubbs*, 336 F.3d at 1202-03).

The proper standard for claims of familial association is more complicated.  As a fundamental liberty interest,[81] the right to familial association between a parent and his or her child would logically be governed by the same standard applicable to other fundamental rights.  However, the Tenth Circuit has consistently applied a balancing test to claims for infringement of the familial association right.[82]  In *Griffen v. Strong,* the Tenth Circuit called for a balancing test to determine whether a state actor's conduct "constituted an undue burden" on a plaintiff's right to familial association.[83]  A court applying the undue burden test should balance the plaintiff's right to familial association against the relevant interests of the state, considering the "severity of the alleged infringement, the need for the defendant's conduct, and any possible alternatives."[84]  This standard clearly involves lower scrutiny than the compelling interest/narrowly tailored test applicable to other fundamental rights.  Indeed, the *Griffen* test requires the plaintiff to show that the state actor directed his conduct at the familial relationship "with knowledge that the . . . conduct will adversely affect that relationship."[85]

In its June 2006 Order, the Court opted to apply the *Griffen* standard as it remains good law in the Tenth Circuit, but noted the conflict between the compelling interest/narrowly tailored

---

[81]*Gomes v. Wood*, 451 F.3d 1122, 1127 (10th Cir. 2006) (reciting parents' fundamental right to "care, custody and control of their children" in removal context).

[82]*See, e.g.*, *Griffen v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993) (applying "undue burden" balancing test to substantive due process claim based on right of familial association between husband and wife); *Suasnavas v. Stover*, 196 Fed. Appx. 647, 656 (10th Cir. 2006) (applying *Griffen* undue burden test) (unpublished decision).

[83]*Griffen*, 983 F.2d at 1547.

[84]*Id.* at 1548.

[85]*Id.*

and undue burden standards.  As the *Seegmiller* decision had no occasion to specifically consider the right to familial association in the child-welfare context or the long line of Tenth Circuit cases applying the undue burden test, the Court will continue to apply the *Griffen* standard to the Jensens' familial association claims.

Clearly, "the right to associate with one's family is a very substantial right."[86]  However, this right "has never been deemed absolute or unqualified."[87]  It is clear that the state may interfere with the right to familial association, even without prior notice and an opportunity to be heard, where such action is needed to ensure the safety of a child.[88]  Thus, the Court must weigh the State's interest in protecting children against the Jensens' interest in familial association, given the factual record presented, to determine whether the State's interference constituted an undue burden on the Jensens' right to familial association.

With this framework in mind, the Jensens' substantive due process claims against Dr. Wagner, Ms. Cunningham, and Mr. Anderson are considered below.[89]

Dr. Wagner.  The Jensens claim that Dr. Wagner violated their substantive due process rights based on the following allegations: (1) Dr. Wagner refused to perform genetic and molecular testing despite the Jensens' requests; (2) Dr. Wagner made this decision because of his desire to enroll P.J. in a clinical trial, which he did not disclose to the Jensens; (3) Dr. Wagner discouraged the Jensens from seeking a second opinion and then attempted to influence that

---

[86]*Id.*

[87]*Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994).

[88]*Gomes*, 451 F.3d at 1128-29.

[89]As discussed above, Ms. Eisenman and Dr. Albritton are entitled to absolute immunity on all of the Jensens' § 1983 claims.

opinion; (4) Dr. Wagner did not inform Dr. Lemons, Dr. Albritton, Dr. Coffin, Dr. Lowichik, Dr. Corwin, Ms. Cunningham, Ms. Eisenman, or the Juvenile Court of his refusal to order genetic and/or molecular testing; and (5) Dr. Wagner told Ms. Cunningham that P.J. could be dead in five days in order to persuade her to skip the normal investigative process.

Having closely examined the record, the Court finds the Jensens have not established that Dr. Wagner violated their substantive due process rights. It is undisputed that Drs. Lowichik and Coffin diagnosed P.J. with Ewing's Sarcoma after performing immunohistochemical testing. According to Dr. Coffin, this diagnosis was rendered with near certainty. Dr. Lowichik estimated her level of certainty "in the high 90 percent."[90] Dr. Coffin told Dr. Wagner that she was confident in the diagnosis and that no further testing was needed. This, according to Dr. Wagner, coupled with the need for immediate treatment, was the reason he did not order additional testing. When the Jensens would not agree to begin treatment that he believed was necessary to save P.J.'s life, Dr. Wagner referred P.J.'s case to DCFS. The Jensens offer no competent evidence to place these facts in dispute. Rather, the Jensens ask the Court to draw a number of unreasonable inferences, which the record plainly will not support, in order to attribute a more dubious purpose to Dr. Wagner's actions.

First, the Jensens point to the fact that Dr. Wagner was an administrator of a clinical trial for which P.J. might have been eligible, arguing that this was the reason behind Dr. Wagner's refusal to order more testing and his insisting on immediate chemotherapy treatment. Even assuming that it was inappropriate to refuse further testing and that Dr. Wagner did refuse the testing with the study in mind, the Jensens were free, at that point, to take P.J. to another facility

---

[90]Docket No. 345, Ex. 16, at 31.

and another doctor for further testing.  Thus, Dr. Wagner's refusal to order further testing did not, of itself, violate the Jensens' right to direct P.J.'s medical care free from unreasonable state interference.

Moreover, outside of P.J.'s possible eligibility to participate in the trial, the Jensens have produced no evidence that Dr. Wagner's decisions were motivated based on a desire to enroll P.J. in the trial.  Indeed, the record would not permit such an inference.  It is undisputed that the trial required enrollment within 30 days of the diagnostic biopsy—which, in P.J.'s case, occurred on May 2, 2003.  Thus, on June 2, 2003, P.J. was no longer eligible to participate in the trial.  If Dr. Wagner's refusal to order the tests and his push to immediately begin chemotherapy were motivated by a desire to enroll P.J. in the clinical trial, surely his efforts would have ceased or changed course after June 2, 2003.  However, it is undisputed that Dr. Wagner's efforts to ensure that P.J. received chemotherapy continued after this date.  It was not until after June 2, 2003, that Dr. Wagner involved Dr. Corwin.  At the June 9, 2003 meeting at PCMC, Dr. Wagner again emphasized the need for P.J.'s chemotherapy to begin immediately before the cancer spread throughout his body.  Finally, it was not until June 16, 2003, that Dr. Wagner referred P.J.'s case to DCFS.  In light of these undisputed facts, it is entirely unreasonable to infer that Dr. Wagner's motivation for not ordering further testing and seeking immediate treatment was to enroll P.J. in the clinical trial.

The Jensens next contend that Dr. Wagner discouraged them from seeking a second opinion and then attempted to interfere with that opinion.  In support of this claim, the Jensens testified that Dr. Wagner told them that insurance companies would often not pay for a second opinion, which would require the Jensens to pay for it.  The Jensens also cite an email sent by Dr. Wagner to the oncologist who was to perform the second opinion, in which he stated,

36

Dear Dr. Grier,

I am a pediatric oncologist sat [sic] the University of Utah, and I was wondering if you could provide consultation for a patient being followed in our clinic. This 12-year-old boy underwent excision of a dome-shaped lesion at the floor of the mouth. After careful review by Cheryl Coffin and other pathologists here in Salt Lake, the diagnosis of Ewing's sarcoma has been made. Supporting this diagnosis are the presence of small round blue cells which stain for O13, FLI-1, and vimentin. There is a weak positivity of S-100. Desmin and actin are negative, as are epithelial markers, CD3, and CD45. There was no fresh or frozen tissue to send for RT-PCR for Ewing's translocations, although this possibly could be done on archival paraffin-embedded tissue. If there is significant diagnostic uncertainty, additional fresh tissue could likely be obtained by re-excision, as the margins were clearly positive.

I have discussed these results with the family, and expressed my confidence in the thorough histologic work-up that has been done by expert personnel. However, the family is interested in pursuing a second opinion, and has requested that we sed [sic] the tslides [sic] and tissue block to you for further review. I have explained that you are an oncologist and not a pathologist, etc., and that further consultations will delay the start of therapy (the child is now 19 days post-resection, as the tissue was initially sent to a pathologist in Washington who made a diagnosis of "poorly differentiated malignancy" after performing a limited immunihistovemocal [sic] work-up). Nevertheless, at their request, I am sending by FedEX the tissue to your institution addressed to you. I would greatly appreciate your help in expediting pathologic review so we can commence with treatment for this young man.[91]

This evidence does not rise to the level of a unconstitutional infringement of the Jensens' right to direct P.J.'s medical care. Whatever his motivations, the Jensens have offered no evidence that Dr. Wagner's statement regarding the likelihood of insurance coverage was false. Although Dr. Wagner clearly expressed confidence in the Ewing's Sarcoma diagnosis, along with his desire to quickly begin treatment, the above email does not support a reasonable inference that Dr. Wagner attempted to interfere with the second opinion sought by the Jensens.

---

[91]Docket No. 345, Ex. 41, at LMW 8.

37

Finally, and most important to their substantive due process claims, the Jensens claim that Dr. Wagner did not tell others involved in P.J.'s case—including Ms. Cunningham, Ms. Eisenman, and the Juvenile Court—of his refusal to order further diagnostic tests despite the Jensens' requests and that he falsely told Ms. Cunningham that P.J. would be dead within five days. With respect to the former, even assuming that Dr. Wagner did in fact fail to tell others about his refusal to order the genetic and/or molecular tests, there is no evidence that he did so deliberately. Rather, as outlined above, the record demonstrates that Dr. Wagner believed that those tests were unnecessary and would delay needed treatment based on the diagnosis of Drs. Coffin and Lowichik. To the extent the Jensens claim substantive due process rights that would impose liability on Dr. Wagner for failing to disclose seemingly irrelevant facts, such rights are not implicit in the concept of ordered liberty and, therefore, do not merit protection under the compelling interest/narrowly tailored standard.

With respect to the latter, it is undisputed that Dr. Wagner communicated the emergency nature of P.J.'s medical situation to DCFS. The Jensens have not provided any evidence that Dr. Wagner did not actually believe this to be true. Instead, they contend that Dr. Wagner convinced Ms. Cunningham to forgo normal investigatory procedures by overstating the immediacy of P.J.'s medical needs, telling her that P.J. would be dead within five days. The Jensens base this assertion entirely on Mr. Anderson's deposition testimony. However, Mr. Anderson did not testify that Dr. Wagner made this statement, but that *someone* told Ms. Cunningham that P.J. would die within five days. Although Mr. Anderson agreed that it was likely the referring doctors, he "never verified who . . . made the statement."[92] More important, Mr. Anderson's

---

[92]Docket No. 345, Ex. 2, at 321.

testimony on this point is inadmissible hearsay and, therefore, must be disregarded.[93] Accordingly, the record merely shows that Dr. Wagner communicated his belief to Ms. Cunningham that P.J. required immediate medical treatment to give him the best chance possible of surviving Ewing's Sarcoma, as diagnosed by the pathologists at PCMC.

In summary, the Jensens ask the Court to find that Dr. Wagner violated their substantive due process rights to familial association and to direct P.J.'s medical care based on unreasonable inferences that stretch the record far beyond its actual content. This does not satisfy their burden of establishing a violation of their constitutional rights.

The Court finds that Dr. Wagner's conduct in providing medical care for P.J. and referring his case to DCFS after the Jensens would not consent to P.J.'s treatment were narrowly tailored to serve the State's compelling interest in protecting children. The record demonstrates that Dr. Wagner referred P.J.'s case to DCFS after the Jensens refused to consent to chemotherapy treatment which Dr. Wagner reasonably believed was necessary to save P.J.'s life. There were, perhaps, additional measures that Dr. Wagner could have taken that *might* have avoided the need to involve DCFS. For example, he might have ordered the additional tests despite his belief that they were unnecessary and would delay needed treatment. However, the constitution does not place an affirmative duty on him to do so where he reasonably believed P.J.'s life was in danger. To the extent the Jensens claim to the contrary, their substantive due process rights are no longer within the boundaries of fundamental rights and, therefore, are only entitled to protection under the shocks the conscience standard—which Dr. Wagner's conduct does not do.

---

[93]*Argo v. Blue Cross and Blue Shield, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

In reaching this conclusion, the Court finds it important that any actual interference with the Jensens' substantive due process rights was accomplished by referring the case to DCFS, filing the Verified Petition, and presenting P.J.'s case to a neutral judge—not by simply removing P.J. from his parents and forcing him to undergo chemotherapy.  Indeed, the Jensens received ample opportunities to present their side of the story to the Juvenile Court.  They were represented by counsel throughout the Juvenile Court proceedings.  The Jensens correctly contend that the Constitution would not permit interference with their substantive due process rights by means of intentional misrepresentations to the Juvenile Court.  However, as outlined above, the Jensens have simply not submitted evidence from which the Court can conclude that Dr. Wagner deliberately misrepresented the events and circumstances surrounding P.J.'s medical care to either the Juvenile Court or others involved in P.J.'s case.

For these same reasons, the Court finds that Dr. Wagner's conduct did not unduly burden the familial association rights of the Jensens and P.J.  Dr. Wagner's decision to refer P.J. to DCFS minimally infringed the Jensens' familial association rights, preserving ample opportunity for the Jensens to present their interests to the Juvenile Court.  Perhaps further discussion might have led to a more amiable solution, but in light of the perceived need for immediate treatment, it was entirely reasonable to submit P.J.'s medical situation to DCFS authorities.  Again, the Jensens are correct that intentional and material factual misrepresentations and omissions on the part of Dr. Wagner to either DCFS representatives or the Juvenile Court would surely have interfered with their associational rights on a much grander scale.  However, the record simply does not sustain these allegations.  Accordingly, the Court will grant Dr. Wagner's Motion for Summary Judgment with respect to the Jensens' substantive due process claims.

Ms. Cunningham.  The Jensens claim that Ms. Cunningham violated their substantive due process rights in two ways: (1) by failing to properly investigate P.J.'s referral; and (2) by making deliberate factual misrepresentations and omissions to the Juvenile Court.

The Court finds that Ms. Cunningham did not violate the Jensens' constitutional rights by failing to investigate the representations of Drs. Wagner and Corwin.  The Jensens' claims have important similarities to the Eighth Circuit case of *Thomason v. SCAN Volunteer Services, Inc.*[94] The plaintiff in *Thomason* brought a substantive due process claim against a state social worker for violation of her right to "the care, custody and management" of her infant child.[95]  The social worker received a report from a doctor who was treating the plaintiff's child, including two letters and an article from the *Journal of Pediatrics*, which stated his concern that the plaintiff might be suffering from a psychological disorder that causes her to partially suffocate her child in order to garner the attention of health care professionals.[96]  Without investigating the allegations, the social worker removed the child from the plaintiff's custody and "arguably mischaracterized" the doctor's report in an affidavit to the juvenile court.[97]  The Eighth Circuit held that the social worker's failure to investigate did not violate the parent plaintiff's constitutional rights where she relied on the doctor's "reasonable suspicion that life-threatening abuse [was] occurring in the home."[98]

---

[94]85 F.3d 1365 (8th Cir. 1996).

[95]*Id.* at 1370.

[96]*Id.* at 1368.

[97]*Id.* at 1372.

[98]*Id.* at 1373.

Similar to the social worker in *Thomason*, Ms. Cunningham relied on the information provided to her by P.J.'s treating physician in filing the Verified Petition. The Jensens have produced no evidence that Ms. Cunningham had reason to suspect the information and opinions given to her by Drs. Wagner and Corwin were misleading. Rather, the Jensens contend that if Ms. Cunningham would have fulfilled her duties under Utah law to investigate P.J.'s referral, she would have discovered the misrepresentations and omissions allegedly made to her by the doctors. However, any duty to investigate that Ms. Cunningham may have had under State law cannot form the basis of a § 1983 claim for violation of substantive due process.[99]

In this emergency situation, like the one in *Thomason*, Ms. Cunningham was reasonable in relying on the information provided to her by the doctors, even in the absence of any further investigation. Dr. Wagner communicated to Ms. Cunningham that P.J.'s situation was a medical emergency and that P.J.'s life was in danger, thus implicating the State's compelling interest in P.J.'s safety. The means used by Ms. Cunningham to address the State's compelling interest in the emergency medical situation were narrowly tailored. Ms. Cunningham did not seek to immediately remove P.J. from the home. Rather, she filed the Verified Petition, thus instituting a state court proceeding where the Jensens would have an opportunity to rebut the doctor's allegations. If the situation had been represented to Ms. Cunningham as something less than an urgent medical emergency, perhaps a duty to investigate could be constitutionally required. Such a duty may be needed in non-emergency situations in order to curb "overzealous suspicion and intervention on the part of health care professionals and government officials," which "may have

---

[99] *See Jones v. City and County of Denver*, 854 F.2d 1206, 1209 (10th Cir. 1988) ("Section 1983 does not, however, provide a basis for redressing violations of *state* law, but only for those violations of *federal* law done under color of state law.").

the effect of discouraging parents and care takers from communicating with doctors or seeking appropriate medical attention for children with real or potentially life-threatening conditions."[100] However, there is nothing in the record to suggest that Ms. Cunningham did not reasonably believe the doctors' contentions that P.J.'s life was in danger and immediate action was necessary to ensure his welfare. Accordingly, the Court finds that the Jensens have not established a constitutional violation of either their right to familial association or their right to direct P.J.'s medical care with respect to Ms. Cunningham's actions in failing to investigate P.J.'s referral and in filing the Verified Petition.

The Court also finds that the Jensens have not established a constitutional violation based on Ms. Cunningham's alleged misrepresentations and omissions to the Juvenile Court. As an initial matter, the Court notes that the Jensens have failed in their opposition memorandum to point out the specific factual misrepresentations and omissions on which they base their claim against Ms. Cunningham. As the Jensens bear the burden of establishing a constitutional violation of the their substantive due process rights, this failure alone entitles Ms. Cunningham to qualified immunity.[101]

Nonetheless, having carefully reviewed their opposition memorandum, the Jensens appear to base their substantive due process claims on three instances in which they contend Ms. Cunningham made factual misrepresentations and omissions to the Juvenile Court: (1) the Verified Petition; and (2) an August 8, 2003 affidavit; and (3) an August 18, 2003 affidavit. The

---

[100]*Thomason*, 85 F.3d at 1373.

[101]"Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Griebel*, 2008 WL 1741503, * 4 (10th Cir. Apr. 14, 2008) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1996)).

Jensens have not brought forth any evidence that Ms. Cunningham knew that the information contained in the Verified Petition was misleading or deficient.  As outlined above, Ms. Cunningham had no constitutional duty to investigate the information provided her by PCMC doctors before filing it.  Thus, Ms. Cunningham's statements in the Verified Petition do not establish a violation of the Jensens' substantive due process rights.  Accordingly, the Jensens' substantive due process claims depend entirely on the misrepresentations and omissions allegedly made by Ms. Cunningham in her August 2003 affidavits.

Assuming the Jensens' version of the facts, the "misrepresentations and omissions" made by Ms. Cunningham in her August 2003 affidavits do not establish a constitutional violation. The Jensens claim that Ms. Cunningham made the following misrepresentations and omissions in both her August 8 and August 18 affidavits: (1) stating that a sample of P.J.'s tumor was sent to Dana-Farber for a second opinion without stating that the second opinion was never given; (2) stating that P.J. underwent a CT and Bone Scan without stating that these tests were normal; (3) stating that the Jensens wanted to use IPT to treat P.J. when they were actually no longer interested; (4) omitting to state that the "controlling" genetic tests were not yet complete; (5) omitting to state that she had not actually spoken with Dr. Coffin; (6) referring to Dr Birkmayer as a man rather than as a doctor; and (7) stating that Dr. Tishler recommended in the July 28, 2003 hearing that P.J. should begin chemotherapy when Dr. Tishler had actually reserved his final opinion until all the testing was complete.

Upon close inspection of the circumstances in which Ms. Cunningham submitted her August 2003 affidavits, the alleged misrepresentations and omissions were of little, if any, consequence.  Of the alleged misrepresentations and omissions listed above, only numbers 4 and

7 have any potential significance.  However, the record clearly reveals that they cannot support the Jensens' claims.

In the hearing held on July 28, 2003, the Juvenile Court clearly ordered that P.J. begin chemotherapy by August 8, 2003.  The Jensens did not begin P.J.'s chemotherapy by that date. Ms. Cunningham's August 2003 affidavits were submitted with the State's application to take P.J. into protective custody as a result of the Jensens' failure to begin P.J.'s chemotherapy.

The hearing transcript shows that Dr. Tishler did in fact recommend that P.J. begin chemotherapy at the July 28 hearing and that any burden to place further test results before the Juvenile Court was on the Jensens.  At the July 28 hearing, Mr. Nakamura clearly advocated the Jensens' concern that some of the testing was not yet completed.  Dr. Tishler indicated that there was no question that P.J. had a malignant tumor that would require chemotherapy and that the remaining pathological and radiological tests would merely serve to clarify what type of tumor he had.  Upon hearing and accepting this, the Juvenile Court ordered that P.J.'s chemotherapy be commenced before August 8, 2003, without regard to the test results.  The Juvenile Court also stated in the July 28 hearing that should the test results indicate that chemotherapy was not needed, the Jensens were free to bring that to the court's attention.  Thus, numbers 4 and 7 were not misrepresentations or omissions at all, as demonstrated by the hearing transcript itself.

The other alleged misrepresentations and omissions were plainly immaterial.  Numbers one, two, and three are listed in Ms. Cunningham's August 18 affidavit as information provided to her by Dr. Wagner around June 16, 2003.  Although this information provided useful background information, it was clearly not material to the issues before the Juvenile Court in mid-August 2003.  Those issues centered on the Jensens' failure to comply with the Juvenile Court's order that P.J. begin chemotherapy by August 8, 2003.  With respect to number 5, Ms.

45

Cunningham did not state that she spoke with Dr. Coffin.  Rather, she merely states that according to Dr. Coffin, the Jensens had Dr. Christensen do a second oral surgery on P.J.'s mouth resulting in an additional sample that was sent to the University of Washington—a fact that the parties do not dispute.  Finally, and exemplary of the "misrepresentations and omissions" the Jensens allege Ms. Cunningham made, Ms. Cunningham's reference to Dr. Birkmayer as a man rather than a doctor was not material to the matters before the Juvenile Court at that time.

The Court finds that the misrepresentations and omissions allegedly made by Ms. Cunningham were completely immaterial to the issues before the Juvenile Court and, therefore, did not interfere with the Jensens' substantive due process rights, even under the compelling interest/narrowly tailored standard.[102]  As outlined above, Ms. Cunningham instituted process before a State court of competent jurisdiction to adjudicate the claim of medical neglect against the Jensens.  In this proceeding, the Jensens' fundamental rights to direct the custody, care, and control of their son were carefully balanced by a neutral judge.  There is simply insufficient evidence that Ms. Cunningham deliberately misrepresented or omitted material facts to the Juvenile Court.

Mr. Anderson.  The Jensens allege that Mr. Anderson violated their rights to familial association and to direct P.J.'s medical care by (1) interfering with their ability to select their doctors; (2) refusing to withdraw the Verified Petition; (3) intentionally failing to disclose material facts to the Juvenile Court; and (4) failing to properly train and supervise DCFS case workers.  The Court finds the Jensens have not established that Mr. Anderson violated their substantive due process rights.

_____

[102]Accordingly, the Court also finds that Ms. Cunningham's actions did not violate the Jensens' substantive due process rights under the undue burden and shocks the conscience tests.

46

First, the Jensens claim that Ms. Anderson violated their right to direct P.J.'s medical care by insisting that the State select the doctor who would treat P.J. According to the Jensens, a parent is entitled to choose the doctor who will provide medical treatment to their child as long as the alternatives are reasonable. They contend that Mr. Anderson "took the position that the State could force the parents to go to the court and let the court decide which physician was 'better,'"[103] thus preventing the Jensens from placing P.J. under the care of either Dr. Birkmayer or Dr. Simone.

The Court finds, based on the circumstances of the case, that this does not amount to a constitutional violation of the Jensens' right to direct P.J.'s medical care. Mr. Anderson's involvement with P.J.'s case did not begin until late August 2003. By this time, the Juvenile Court had already held a number of hearings to determine the medical care that was in P.J.'s best interest. To that end, the Juvenile Court ordered P.J. to begin chemotherapy administered by a board-certified pediatric oncologist by August 8, 2003. The Jensens did not meet this deadline and the Juvenile Court granted protective custody of P.J. to the State. It was at this point that Mr. Anderson become involved in the case, attempting to negotiate a mutually agreeable solution. In his negotiations, Mr. Anderson took the position that P.J. must be treated with chemotherapy by a board-certified pediatric oncologist. This position was in accord with both the Juvenile Court's order and the opinion of Dr. Tishler who had evaluated P.J. Most important, as even the Jensens' acknowledge, Mr. Anderson's position was that if the Jensens wanted a different doctor, they could make their request to the Juvenile Court. The Juvenile Court was readily available to hear and determine whether the Jensens' desire to have a different doctor treat P.J. was in his best

---

[103]Docket No. 340, at 9.

interest.  In light of these undisputed facts—particularly the fact that the negotiations were conducted during the course of the Juvenile Court proceedings, which provided ample process—Mr. Anderson's "position" that having a board-certified pediatric oncologist treat P.J. was in his best interest was narrowly tailored to serve the State's compelling interest in protecting P.J.  Accordingly, such does not amount to a constitutional violation.

The Jensens also allege that Mr. Anderson violated their constitutional rights by refusing to withdraw the medical neglect allegations despite his admission that the Jensens were not neglectful parents.  The Jensens base this assertion on their depositions, in which they testified that during negotiations with Mr. Anderson in late August 2003, Mr. Anderson said, "I understand you're a great parent.  I can see that, but we can't let you go.  We can't have it over. It's gone too far."[104]  The Jensens ask the Court to infer from this that Mr. Anderson knew the Jensens were not guilty of medical neglect but chose to maintain the Verified Petition anyway for political reasons.

These statements do not establish a violation of the Jensens' substantive due process rights.  The negotiations between the Jensens and Mr. Anderson began in late August 2003, after the Juvenile Court had already granted protective custody of P.J. to the State and ordered that he undergo chemotherapy to treat the cancer that multiple medical professionals indicated he had. Mr. Anderson traveled to Idaho in an attempt to negotiate an amiable resolution with the Jensens. The above statements were allegedly made during the course of these negotiations.  Upon this background of undisputed facts, the Court cannot reasonably infer from Mr. Anderson's alleged statements that the medical neglect allegations were baseless, that Mr. Anderson knew it, and

---

[104]Docket No. 345, at ¶ 382.

that he admitted as much to the Jensens.  Mr. Anderson's attempt to negotiate a workable solution to the out-of-hand situation in no way interfered with the Jensens' right to familial association or their right to direct P.J.'s medical care.

The Jensens also allege that Mr. Anderson violated their substantive due process rights by intentionally failing to inform the Juvenile Court of the following: (1) definitive testing had never been performed on P.J.'s tissue; and (2) Dr. Johnston had materially breached his agreement to refrain from rendering a diagnosis before completing the independent testing.

These allegations provide neither a factual nor legal basis to find that Mr. Anderson violated the Jensens' substantive due process rights.  With regard to first alleged omission, the Jensens have not directed the Court to evidence that Mr. Anderson knew the Juvenile Court was unaware of the possibility for genetic testing or that genetic tests were "definitive."  Rather, they cite to the deposition testimony of P.J.'s guardian ad litem in which she indicates that *she* was unaware of the possibility for genetic testing until September 4, 2003.  This does not show that Mr. Anderson intentionally withheld information about genetic testing from the Juvenile Court. Moreover, the Jensens repeatedly stated their desire for further testing during the Juvenile Court proceedings.

With respect to the second alleged omission, the Jensens contend that Mr. Anderson was aware that Dr. Johnston had determined to recommend chemotherapy before receiving the results of the genetic tests in violation of the September 5, 2003 stipulation and that Mr. Anderson failed to inform the Juvenile Court of this fact.  Mr. Anderson testified that he understood Dr. Johnston would perform an independent evaluation of P.J.'s medical condition, including independent testing, before rendering a final treatment recommendation.  Mr. Anderson also testified that he was aware the genetic tests were not finished when Dr. Johnston determined to recommend

49

chemotherapy.  However, there is no evidence that Mr. Anderson understood that rendering a diagnosis before completion of the genetic testing breached the September 5 stipulation.  The deposition testimony cited by the Jensens only refers to "independent testing."[105]  There is no indication in either Mr. Anderson's testimony, or in the written stipulation, that Dr. Johnston could not have sufficiently confirmed the diagnosis through independent testing, like the pathological testing conducted by Dr. Coffin, even though the genetic testing was not complete.  Moreover, there is no evidence showing that Mr. Anderson intentionally withheld the fact that the genetic testing was incomplete from the Juvenile Court.  The Court cannot find that Mr. Anderson was deliberately withholding information from the Juvenile Court based merely on the fact that he knew the genetic tests—which Dr. Johnston testified were immaterial to his treatment recommendation—were not yet complete.  Most important, the Jensens have failed to show how Mr. Anderson's alleged failure to disclose this information interfered with their right to direct P.J.'s medical care.  The Jensens refused to follow Dr. Johnston's treatment recommendations, which lead to DCFS's decision to dismiss the case shortly thereafter.  The only action taken by the Juvenile Court subsequent to Dr. Johnston's recommendation was to dismiss the case.

Finally, the Jensens argue that Mr. Anderson should be liable for failure to adequately train and supervise DCFS case workers.  Presumably, although it is far than clear, the Jensens claim that Mr. Anderson is liable for the injuries resulting from Ms. Cunningham's actions in failing to properly investigate P.J.'s referral because he failed to train her.  The Jensens cite to the case of *City of Canton v. Harris*[106] for the proposition that a supervisor who acts with deliberate

---

[105]Docket No. 345, Ex. 2, at 249.

[106]489 U.S. 378 (1989).

indifference in failing to train and supervise subordinates is subject to liability under section 1983.

The Jensens' failure to train and supervise claim fails for two reasons.  First, the Jensens have not brought any evidence to the Court's attention that could show Mr. Anderson acted with "deliberate indifference"[107] to the rights of others in failing to train Ms. Cunningham.  Second, the Jensens have not established that Ms. Cunningham's conduct violated their constitutional rights, a prerequisite to Mr. Anderson's liability for failure to train her.[108]

In sum, the Court finds that none of Mr. Anderson's actions during his involvement with P.J.'s case interfered with the Jensens' substantive due process rights.

2.  Procedural Due Process

The Jensens claim that each of the Defendants violated their procedural due process rights.  Ms. Cunningham, Ms. Eisenman, and Mr. Anderson present argument on these claims. Dr. Wagner incorporates these arguments by reference.  However, as Ms. Eisenman and Dr. Albritton enjoy absolute immunity, the Jensens' procedural due process claims against them are not discussed.

Ms. Cunningham.  The Jensens claim that Ms. Cunningham violated their procedural due process rights by failing to properly investigate P.J.'s referral and by intentionally misrepresenting facts to the Juvenile Court.

At its most basic level, due process ensures that a person may not be deprived of an interest in life, liberty, or property without "the opportunity to be heard at a meaningful time and

---

[107]*Id.* at 388.

[108]*Id.* at 391.

in a meaningful manner."[109]  As noted by the Court in its June 2006 Decision, the Due Process

Clause also requires that "the notice and hearing . . . be fair."[110]  Accordingly, in considering the

Defendants' motions to dismiss in June 2006, the Court found that the Jensens' allegation that

"[Ms. Cunningham] intentionally misrepresented or omitted facts in the Jensens' case, including

the status of allegedly confirmatory tests, to the Utah juvenile court" was sufficient to state a

claim for violation of their rights to procedural due process.[111]

However, as set forth above, the Jensens have failed to submit evidence that Ms.

Cunningham deliberately made material misrepresentations and omissions to the Juvenile Court.

Rather, the Jensens merely nitpick Ms. Cunningham's August 2003 affidavits.  These alleged

misstatements are not the type of intentional falsities that would render an otherwise procedurally

sound judicial proceeding "unfair."[112]  Rather, these misrepresentations, which dealt with facts

known to the Jensens, were more properly addressed by the Jensens' counsel at the August 8,

2003 hearing before the Juvenile Court.  For example, the Jensens' counsel could, if desired,

easily have pointed out to the Juvenile Court that Dr. Birkmayer was more than just a "man."

Thus, the Jensens have not established a violation of their procedural due process rights with

regard to the alleged factual misrepresentations and omissions.

---

[109]*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)) (internal quotation marks omitted).

[110]Docket No. 52, at 23 ("[T]he Due Process Clause also encompasses . . . a guarantee of *fair* procedure.") (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)) (internal quotation marks omitted).

[111]*Id.*

[112]*See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) (finding due process violation where witness gave perjured testimony that he had received no promise in return for his testimony when in reality he had).

Additionally, the Court finds that the Jensens' had no liberty interest in the investigation of child abuse claims required of DCFS case workers under Utah law and, therefore, cannot establish a violation of their procedural due process rights by virtue of Ms. Cunningham's failure to carry out that investigation.  "Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States."[113]  A State may create a liberty interest "by establishing substantive predicates to govern official decision-making . . . and by mandating the outcome to be reached upon a finding that the relevant criteria have been met."[114]  Both of these elements are necessary for the creation of a liberty interest.  Thus, where state law requires the fulfilment of specified substantive predicates but does not mandate a certain outcome, there is no liberty interest.[115]

"State-created procedures . . . do not create such an entitlement where none would otherwise exist."[116]  As stated by the Supreme Court: "Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."[117]  For example, in *Pierce v. Delta County Department of Social Services*, the plaintiffs argued that Colorado's Child Protection Act created a liberty interest by mandating

---

[113]*Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 461 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)) (internal quotation marks omitted).

[114]*Id.* at 462 (quoting *Hewitt*, 459 U.S. at 472) (internal quotation marks omitted).

[115]*Id.* at 464-465.

[116]*Pierce v. Delta County Dept. of Soc. Servs.*, 119 F. Supp. 2d 1139, 1152-53 (D. Colo. 2000).

[117]*Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

53

that acts of child abuse be reported and properly investigated.[118]  The court rejected this contention, finding that the Colorado statutes at issue merely mandated procedure without dictating "a particular substantive outcome or guarantee."[119]

The Jensens contend that Utah law, by statue, imposes mandatory duties to perform specific investigative actions before doing anything that might affect parental rights.  Even assuming that this is the case, the Jensens merely assert a liberty interest in process, not in substantive outcomes.  The Jensens do not point to any section of the Utah Code that sets forth a specific substantive predicate that, when fulfilled, dictates a specific *substantive* outcome.  This does not create the sort of entitlement protected by the Due Process Clause.

Thus, the Jensens have failed to establish that Ms. Cunningham violated their procedural due process rights.

<u>Mr. Anderson</u>.  The Jensens claim that Mr. Anderson implemented a policy whereby case workers would not investigate allegations of medical neglect when made by doctors from PCMC and that this policy violated their due process rights.[120]  The Jensens also claim that this policy violated their right to equal protection.  However, because they did not plead an equal protection claim, and apparently asserted it for the first time in the summary judgment briefing, the Court will not consider this argument.

---

[118]*Pierce*, 119 F. Supp. 2d at 1153.

[119]*Id.*

[120]At some point, the Jensens also claimed that Mr. Anderson made factual misrepresentations and omissions to the state courts.  However, the Jensens have not pursued this theory in their summary judgment briefing and have submitted no evidence to support it.

The Jensens have failed to submit any evidence that DCFS actually had a policy of not investigating medical neglect allegations if they were made by PCMC doctors.  Rather, the Jensens ask the Court to infer that such a policy was instituted by Mr. Anderson based on the following: (1) Ms. Cunningham did not investigate P.J.'s referral; (2) Ms. Cunningham testified that she believed her actions were consistent with DCFS policy; and (3) Ms. Cunningham testified that Mr. Anderson told her she handled P.J.'s case appropriately.  This evidence is simply not enough to show that DCFS had a policy of never investigating medical neglect allegations made by PCMC doctors.  Ms. Cunningham's alleged failure to investigate P.J.'s referral took place in a situation that was represented to her by Dr. Wagner as a medical emergency requiring prompt action.  To the extent that her alleged failure to investigate did represent DCFS policy, it merely shows that DCFS policy allowed case workers to file a custody petition with a juvenile court of competent jurisdiction without further investigation when presented with objectively reasonable allegations of emergency medical neglect made by a doctor charged with the child's medical care.  As explained in detail above, such a policy would not violate a parent's rights under the Due Process Clause.  Moreover, even if DCFS did have a policy of never investigating referrals submitted by PCMC doctors, such a policy did not harm the Jensens in P.J.'s emergency case.  Thus, the Court finds the Jensens have failed to establish that Mr. Anderson violated their procedural due process rights.

Dr. Wagner.  As the Jensens received ample notice and an opportunity to be heard, any procedural due process claims against Dr. Wagner must be based on his alleged misrepresentations and omissions.  However, as set forth above, the Jensens have not submitted competent evidence that Dr. Wagner deliberately misrepresented or omitted material facts to the Juvenile Court or others involved in the case.  Moreover, any misrepresentations and omissions

55

allegedly made by Dr. Wagner did not make the Juvenile Court proceedings unfair.  The record demonstrates that the Jensens received ample opportunity to present their desire for further testing in the Juvenile Court.  In fact, these desires were heard and decided upon by that court. The Jensens have not established that Dr. Wagner violated their procedural due process rights.

       3.  Malicious Prosecution

In their third cause of action, the Jensens[121] allege that each of the Defendants[122] violated their Fourth Amendment right to be free from unreasonable seizures by instituting and continuing a "malicious prosecution."  Each of the Defendants has moved for summary judgment on this claim.  Notably, the Jensens have failed to respond to Mr. Anderson's motion on this point.  Accordingly, the Court will grant his motion with respect to the Fourth Amendment claim.

Under Tenth Circuit law, analysis of a § 1983 claim for malicious prosecution in violation of the Fourth Amendment is guided by the elements of the common law tort of malicious prosecution.[123]  However, "the ultimate question in such a case is whether plaintiff has proven the deprivation of a constitutional right."[124]  As recently stated by the Tenth Circuit in *Wilkins v. DeReyes,*

---

[121]As the Court dismissed P.J.'s Fourth Amendment claim in its June 2006 Order, Mr. and Ms. Jensen proceed without him on this claim.

[122]The Jensens' malicious prosecution claims against Ms. Eisenman and Dr. Albritton are not discussed in light of their absolute immunity.

[123]*Becker v. Kroll*, 494 F.3d 904, 913-14 (10th Cir. 2007).

[124]*Wilkins v. DeReyes*, 528 F.3d 790, 797 (10th Cir. 2008) (quoting *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257-58 (10th Cir. 2007)) (internal quotation marks omitted).

> Under our cases, a § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.[125]

The Jensens seek damages for malicious prosecution arising from both the Juvenile Court proceedings and the criminal case.

### a.  Juvenile Court Proceedings.

To establish a § 1983 claim for malicious prosecution under the Fourth Amendment, the plaintiff must show that a seizure actually occurred.[126]  In *Becker v. Kroll*, the Tenth Circuit considered a § 1983 plaintiff's claim that she was seized within the meaning of the Fourth Amendment even though she "was never arrested, incarcerated, or otherwise placed under the direct physical control of the state."[127]  The plaintiff—who was charged with a felony offense in a state court—argued that investigation into her alleged criminal activity "imposed burdens on her time, finances, and reputation by requiring her to travel to and attend meetings, pay legal costs, and eventually, face criminal charges" and, therefore, constituted a seizure for Fourth Amendment purposes.[128]  The court declined "to expand Fourth Amendment liability in cases where the plaintiff has not been arrested or incarcerated."[129]  Specifically, the court noted that were it to impose Fourth Amendment liability in cases that lacked a traditional seizure, "every

---

[125]*Id.* at 799.

[126]*Becker*, 494 F.3d at 914.

[127]*Id.* at 915.

[128]*Id.* at 914.

[129]*Id.* at 915.

charging decision would support a § 1983 malicious prosecution-type claim no matter the context."[130]

It is undisputed that neither Mr. Jensen nor Ms. Jensen was arrested, incarcerated, or otherwise placed under the direct physical control of the State as a result of the proceedings in the Juvenile Court. Recognizing this, the Jensens argue that the Court should expand the Fourth Amendment concept of "seizure" to accord with that proposed in Justice Ginsberg's concurrence in *Albright v. Oliver*.[131] The Jensens contend that they suffered "significant, ongoing deprivation[s] of liberty as a result of the Juvenile Court proceedings," which constitute a seizure under the Fourth Amendment, as follows:

> The Jensens were unable to return to the state of Utah (their home) without the threat of arrest and removal of their child. They were unable to take their child for an evaluation in Houston, and to other physicians of their choosing, because the State forbid it. They were subjected to mandatory court appearances. They were ordered to give up their passports. [Mr. Jensen] lost his job, and was exposed to serious diminishment of other employment prospects, both because he was terminated from his previous job, and because he had to devote his time, finances, energy and efforts to attempting to protect his and his family's rights. The Jensens were subjected to close media scrutiny and held up to public ridicule and contempt. Finally, the Jensens endured the horrible financial and emotional strain of defending their family from neglect proceedings that were based entirely upon misrepresentations and deceit.[132]

Although acknowledging the burdens experienced by the Jensens in defending themselves, the Court simply cannot find that they experienced a Fourth Amendment seizure as a result of the Juvenile Court proceedings. Tenth Circuit precedent clearly mandates the contrary.

---

[130]*Id.*

[131]510 U.S. 266 (1994).

[132]Docket No. 342, at 15-16.

Accordingly, the Court finds that the Jensens have failed to establish a Fourth Amendment violation related to the Juvenile Court proceedings.

b.  Criminal Case

With regard to the criminal case, the Defendants focus their challenges on the first and third prongs above: causation and probable cause.  Because it is clear that neither Dr. Wagner nor Ms. Cunningham caused the prosecution of the criminal action against the Jensens, analysis of probable cause is unnecessary.

In order to establish a constitutional violation, the Jensens must show that Dr. Wagner and Ms. Cunningham "caused the plaintiff's continued confinement or prosecution."[133]  In *Pierce*, the Tenth Circuit held that this element reaches more than just those who actually initiate a criminal action.[134]  Surveying both the common law and cases interpreting the reach of the Fourth Amendment, the court concluded that a forensic analyst who fabricated inculpatory evidence and withheld exculpatory evidence, thereby leading prosecutors to indict and prosecute" the plaintiff, sufficiently caused the plaintiff's continued prosecution for purposes of the plaintiff's § 1983 claim, even though she did not formally initiate the charges.[135]  In each of the examples used by the *Pierce* court to reach this conclusion, the state actor's conduct was closely connected to either the initiation or continuation of the prosecution.[136]  Notably, the

---

[133]*Wilkins*, 528 F.3d at 799.

[134]*Pierce*, 359 F.3d at 1291-92.

[135]*Id.* at 1291-94.

[136]*Id.* at 1292 ("[A] private person who takes an active part in *continuing or procuring the continuation of criminal proceedings initiated by himself or by another* is subject to the same liability for malicious prosecution as if he had initiated the proceedings.") (citing Restatement (Second) Torts § 655); *id.* (citing *Robinson v. Maruffi*, 895 F.2d 649, 655-56 (10th Cir. 1990)

principles described by the *Pierce* court closely resemble the definition of a complaining witness provided in *Anthony v. Baker*[137] for purposes of determining the applicability of prosecutorial immunity: "The term 'complaining witness' describes the person (or persons) who actively instigated or encouraged the prosecution of the plaintiff."[138]

The Court finds that Dr. Wagner did not cause the initiation or continued prosecution of the criminal case. The Jensens' claims with regard to Dr. Wagner relate entirely to information provided to DCFS, its representatives, Ms. Eisenman, and the Juvenile Court. In fact, Dr. Wagner moved to Ohio in late June 2003 during the pendency of the Juvenile Court proceedings and before any change in P.J.'s legal custody. Dr. Wagner's final involvement with the Juvenile Court proceedings was his execution of an affidavit dated July 22, 2003, outlining basically the same information provided previously to DCFS in his case summary. Dr. Wagner executed the affidavit at Ms. Eisenman's request. The affidavit was to be used in connection with the Juvenile Court proceedings. There is no evidence that Dr. Wagner ever had contact with anyone from the District Attorney's Office. Initiation and continuation of the criminal case were dependant on multiple intervening events, including, most notably, the Jensens failure to comply with the Juvenile Court's orders. Thus, Dr. Wagner did not cause the initiation or continuation of the

---

(finding "sufficient evidence for the jury to find that the [defendant police officers] purposefully concealed and misrepresented material facts to the district attorney which may have influenced his decision to prosecute [the plaintiff]")); *id.* ("If police officers have been instrumental in the plaintiff's continued confinement or prosecutions, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors, or magistrates to confine or prosecute him.") (quoting *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)).

[137]955 F.2d 1395 (10th Cir. 1992).

[138]*Id.* at 1399 n.2.

criminal case based solely on his referral of P.J.'s case to DCFS and his limited participation in the Juvenile Court proceedings.

The Court likewise finds that Ms. Cunningham did not cause the initiation or continued prosecution of the criminal case. The Jensens argue that Ms. Cunningham's participation in the criminal case is shown by the fact that her name appears on the probable cause statement on which the criminal charges were based and that Ms. Eisenman testified that Ms. Cunningham provided information to Officer Peterson, who authored that statement. Even if this were true,[139] it does not provide an evidentiary basis on which the Court could conclude that Ms. Cunningham caused the prosecution of the criminal case. The Jensens do not indicate what information Ms. Cunningham may have provided nor its relevance to the criminal charges—nor do they indicate the circumstances in which Ms. Cunningham provided the information. Accordingly, the Court finds the Jensens have failed to establish that Ms. Cunningham caused the initiation or continuation of the criminal prosecution.

The Jensens argue that the Court should apply principles of concurrent causation to hold all of the Defendants liable for the malicious prosecution. In the § 1983 context, "[w]here multiple forces are actively operating . . . plaintiffs may demonstrate that each defendant is a concurrent cause by showing that his or her conduct was a substantial factor in bringing [the injury] about."[140] Where concurrent causation is established, the burden of proof shifts to each

---

[139]In reality, the Court cannot assume Ms. Eisenman so testified because the deposition pages cited by the Jensens were left out of their exhibits, despite receiving an opportunity to supplement the record. *See* Docket No. 375 (ordering the Jensens to provide any materials inadvertently omitted from their exhibits).

[140]*Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) (quoting *Northington v. Marin*, 102 F.3d 1564, 1568-69 (10th Cir. 1996)) (internal quotation marks omitted).

defendant to prove that his conduct was not the cause of the harm.[141]  Should a defendant fail to do so, he is liable for the whole injury under principles of joint and several liability.[142]

The Jensens have not shown that principles of concurrent causation should apply to their Fourth Amendment claim.  The Jensens have not submitted any evidence that Dr. Wagner or Ms. Cunningham provided information to the District Attorney's Office or that their involvement in the Juvenile Court case led to the initiation or continuation of the criminal charges.  In fact, this is not even consistent with the Jensens' version of the facts: "Eisenman was driving the criminal charges effort, not McDonald or Cunningham."[143]  Accordingly, there is no evidentiary basis on which to apply principles of concurrent causation and joint and several liability to the Jensens' claim for malicious prosecution of the criminal case.  Therefore, the Court finds that the Jensens have not established that Dr. Wagner and Ms. Cunningham violated their Fourth Amendment rights.

D.  State Law Claims

The Court does not have original jurisdiction over any of the Jensens' state law claims. As this Order disposes of all of the Jensens' federal claims, and as their Utah constitutional claims present important questions of state law, the Court declines to further exercise supplemental jurisdiction over the state law claims and will remand them to the Third Judicial District Court for Salt Lake County, State of Utah, from which this case was removed.[144]

---

[141]*Northington*, 102 F.3d at 1568.

[142]*Id.* at 1569.

[143]Docket No. 342, at 20.

[144]*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988); 28 U.S.C. §§ 1367(c)(1), (2); 1447(c).

IV. CONCLUSION

For all of the reasons set forth above, it is hereby

ORDERED that Defendant Richard Anderson's Motion for Summary Judgment [Docket No. 324], Defendant Kari Cunningham's Motion for Summary Judgment [Docket No. 326], Defendant Susan Eisenman's Motion for Summary Judgment [Docket No. 329], and Defendants Wagner and Albritton's Motion for Summary Judgment [Docket No. 332] are GRANTED IN PART with respect to Claims 1, 2, and 3 of the Complaint.  It is further

ORDERED that Defendant Susan Eisenman's Motion to Strike Plaintiffs' Consolidated Statement of Fact [Docket No. 349], Defendant Wagner's and Albritton's Motion to Strike References to P.J.'s Current Condition [Docket No. 353], Defendants Wagner's and Albritton's Motion to Strike Plaintiffs' Hearsay [Docket No. 356], and Defendant Wagner's and Albritton's Motion to Strike Plaintiffs' Attempts to Rebut Medical Evidence Without Expert Testimony [Docket No. 358] are  DENIED AS MOOT.  It is further

ORDERED that the Jensens' state law claims (Claims 5, 6, 7, 9, and 10) are REMANDED to the Third Judicial District Court for Salt Lake County, State of Utah.  It is further

ORDERED that the Clerk of the Court is directed to close this case forthwith.

DATED September 22, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge

63